**Barry L. BATTELSTEIN and Jerry E. Battelstein, Plaintiffs-Appellees,**

v.

**INTERNAL REVENUE SERVICE, Defendant-Appellant.**

No. 77–3212.

United States Court of Appeals, Fifth Circuit.

Feb. 14, 1980.

Rehearing En Banc Granted April 11, 1980.

**1034**

M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Acting Chief, App. Section, Robert A. Bernstein, Gayle P. Miller, William Friedlander, Attys., Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellant.

Marc E. Grossberg, David Cowan, Hugh M. Ray, Houston, Tex., for plaintiffs-appellees.

Before COLEMAN, Chief Judge, FRANK M. JOHNSON, Jr. and POLITZ, Circuit Judges.

FRANK M. JOHNSON, Jr., Circuit Judge:

Barry L. Battelstein in November, 1976, and Jerry E. Battelstein in April, 1977, filed Chapter XI petitions in bankruptcy in the United States District Court for the Southern District of Texas. In the ensuing proceedings, the Internal Revenue Service (IRS) filed proof of claims against each.

The Battelsteins objected to the claims and their objections were consolidated for trial. In June, 1977, after trial, the bankruptcy judge denied the IRS claims. In August, 1977, the district court affirmed this denial. The IRS filed this appeal.

The controversy stems from deductions claimed by the Battelsteins for interest paid on indebtedness. The Battelsteins were land developers. Gibraltar Savings Association was their lender. In 1971, Gibraltar agreed to loan the Battelsteins more than three million dollars to cover the purchase of a piece of property known as Sharpstown. Gibraltar also agreed to make to the Battelsteins, if desired, future advances of the interest costs on this loan as they became due.[1] As it happened, the Battelsteins never paid interest except by way of these advances. Each quarter, Gibraltar would notify the Battelsteins of current interest due. The Battelsteins would then send Gibraltar a check in this amount, and, on its receipt, Gibraltar would send the Battelsteins its check in the identical amount. Although the 1971 agreement provided that these advances were to be evidenced by new notes, it is unclear whether new notes were ever executed.[2] The bankruptcy judge and the district judge found that the Battelsteins were correct in deducting the amount of the interest as interest paid on indebtedness. This finding was clearly in error.

Under § 163(a) of the Internal Revenue Code of 1954, 26 U.S.C. § 163(a), cash basis taxpayers such as the Battelsteins may take a deduction for interest paid within the taxable year on indebtedness. The dispute in this case turns on whether or not the Gibraltar-Battelstein arrangement resulted in interest being "paid."

The Battelsteins do not contend, nor could they seriously, that any of the notes that they may have given Gibraltar for the interest advances could have resulted in payment. As the Supreme Court recently

---

1. In partial consideration of its entrance into the agreement Gibraltar was promised a 19 per cent profit participation in the value of the property when finally sold.

2. The Battelsteins testified that they could not recall.

reiterated in a related context, payment for tax purposes must be made in cash or its equivalent, and a note promising payment of cash in the future is not cash or its equivalent. *Don E. Williams Co. v. Commissioner,* 429 U.S. 569, 577–78, 97 S.Ct. 850, 51 L.Ed.2d 48 (1977).[3] The Court explained that the note may never be paid, and if it is not paid, the taxpayer has parted with nothing more than his promise. *Id.* at 578, 97 S.Ct. 850, *quoting Hart v. Commissioner,* 54 F.2d 848, 852 (1st Cir. 1932).

■ The Battelsteins strenuously argue that the exchange of checks with Gibraltar did result in interest being "paid." This argument is without merit. The Battelsteins have asserted business reasons for putting off the interest payments,[4] but they do not assert, nor is it possible to infer, any purpose other than tax avoidance for the check exchange method employed to do so. Although there are a great many transactions which may properly be undertaken principally with a view to minimizing taxes, e. g., buying tax-free municipal bonds instead of higher-yielding corporate securities, or selling property at the close of one year rather than the start of another in order to accelerate the recognition of a loss, creating a superficial payment structure

solely to reap the benefits of § 163(a) is not one of them. *See Knetsch v. United States,* 364 U.S. 361, 367, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960); *Salley v. Commissioner,* 464 F.2d 479, 480, 482–83 (5th Cir. 1972); *Goldstein v. Commissioner,* 364 F.2d 734, 740 (2d Cir. 1966).[5] To give significance to the check exchange would be to exalt artifice over reality and deprive § 163(a) of all serious purpose. *Cf. Gregory v. Helvering,* 293 U.S. 465, 470, 55 S.Ct. 266, 79 L.Ed. 596 (1935). Given its sham nature, the exchange should be ignored. *See Waterman Steamship Corp. v. Commissioner,* 430 F.2d 1185, 1192 (5th Cir. 1970); *Owens v. Commissioner,* 568 F.2d 1233, 1240 (6th Cir. 1977); *Gilbert v. Commissioner,* 248 F.2d 399, 411 (2d Cir. 1957) (Hand, J., dissenting). When the exchange is ignored, it is obvious that the Battelsteins' arrangement resulted in nothing more than promises to pay and not, as the Supreme Court has required, actual payment. *See Don E. Williams Co. v. Commissioner, supra,* 429 U.S. at 578, 97 S.Ct. 850. Accordingly, the deductions should not have been allowed.

The Battelsteins' reliance on the line of Tax Court cases beginning with *Burgess v. Commissioner,* 8 T.C. 47 (1947), is mis-

---

**3.** In the *Williams* case, the Court relied on two earlier decisions articulating the same principle: *Helvering v. Price,* 309 U.S. 409, 60 S.Ct. 673, 84 L.Ed. 836 (1940), and *Eckert v. Burnet,* 283 U.S. 140, 51 S.Ct. 373, 75 L.Ed. 911 (1931). Based on *Price, Eckert,* or other precedent established on their authority, courts have refused to consider "paid" and deductible interest satisfied by a note promising future payment, *Hart v. Commissioner,* 54 F.2d 848, 850–52 (1st Cir. 1932); interest "withheld" by the lender from the original loan, *Parks v. United States,* 434 F.Supp. 206, 211 (N.D.Tex.1977); *Heyman v. Commissioner,* 70 T.C. 482, 485–87 (1978); *Rubnitz v. Commissioner,* 67 T.C. 621, 628 (1977); *Hopkins v. Commissioner,* 15 T.C. 160, 181 (1950); *Cleaver v. Commissioner,* 6 T.C. 452, 454 (1946), *aff'd,* 158 F.2d 342, 344 (7th Cir.), *cert. denied,* 330 U.S. 849, 67 S.Ct. 1093, 91 L.Ed. 1293 (1947); interest "withheld" by the lender from a subsequent loan, *Keith v. Commissioner,* 139 F.2d 596, 597 (2d Cir. 1944); *Nat Harrison Associates, Inc. v. Commissioner,* 42 T.C. 601, 623–25 (1964); or interest paid by an increase in the original principal, *England v. Commissioner,* 34 T.C. 617, 621 (1960). In *Williams,* the Court noted the *Cleaver* decision,

429 U.S. at 578 n. 9, 97 S.Ct. 850, and quoted from *Hart, id.* at 578.

**4.** The bankruptcy judge found that the loan agreement was "clearly no sham business deal conceived solely to render the debtors a tax deduction," and explained that the business purpose of the interest advances was "to enable the owners of the Sharpstown property to maintain ownership of the property for an extended period of time, and to make improvements, including the addition of utilities."

**5.** Section 163(a) is an accounting provision and, like tax accounting provisions generally, it invites evasion. In the cases cited, taxpayers structured elaborate loan transactions in order to create indebtedness giving rise to interest deduction opportunities. Finding that the transactions had no purpose other than tax avoidance, the courts disallowed the interest deductions in full. In this case, the indebtedness and interest opportunities apparently had business substance; it was the check exchange method claimed to have "paid" them that did not. The distinction is unimportant.

placed.[6] The *Burgess* cases establish an exception inapplicable to the facts of this case. In *Burgess* and its progeny, the Tax Court held that interest may be considered paid even though the taxpayer may have paid it with money subsequently borrowed from the initial lender, so long as the money subsequently borrowed actually passed into the hands or bank account of the taxpayer, was commingled with other funds of the taxpayer and thus became subject to the ·taxpayer's unrestricted control. *Burgess v. Commissioner, supra*, 8 T.C. at 49–50. *See also Wilkerson v. Commissioner*, 70 T.C. 240, 257–61 (1978); *Burck v. Commissioner*, 63 T.C. 556, 559–60 (1975), *aff'd on other grounds*, 533 F.2d 768 (2d Cir. 1976). Here the last condition was not satisfied. Because Gibraltar did not issue the Battelsteins its check until it had their check already in hand, it cannot be said that the interest money advanced by Gibraltar ever became commingled with the Battelsteins' other funds and subject to the Battelsteins' unrestricted control. Moreover, it should be kept in mind that the *Burgess* conditions were apparently developed as a guide to distinguish sham payments from legitimate payments. The conditions notwithstanding, the Battelsteins' check exchange was, as noted above, obviously a sham.

■ Even if applicable, the *Burgess* exception is of doubtful validity.[7] The principal distinction between the *Burgess* cases and the *Don E. Williams Co.* cases [8] is that in the *Burgess* cases the payment of interest claimed by the taxpayer was alleged to have occurred not through a paper transaction with the lender of the principal, such as the giving of a note or the withholding of interest from principal, but by an actual exchange of funds. *See Burgess v. Commissioner, supra*, 8 T.C. at 49–50. This distinction has no creditable basis. *Id.* at 50–

51 (Kern, J., dissenting). The lender's additional loan and the taxpayer's 'payment' of interest add up to no more than a postponement, not payment, of the taxpayer's interest obligation to the lender. *Cf.·Minnesota Tea Co. v. Helvering*, 302 U.S. 609, 613, 58 S.Ct. 393, 395, 82 L.Ed. 474 (1938) ("A given result at the end of a straight path is not made a different result because reached by following a devious path.") Contrary to the Battelsteins' claims, the distinction is not saved by analogy to the well-established rule that, where a taxpayer borrows money from a third party to pay interest due his original lender, the interest is considered paid and deductible. *See, e. g., McAdams v. Commissioner*, 15 T.C. 231, 235 (1950). This rule is clearly inapposite. In the third-party situation, deduction is appropriate because the obligation as between the borrower and the original lender has not been postponed, it has been extinguished. A default by the taxpayer would not revive it. *Crain v. Commissioner*, 75 F.2d 962, 964 (8th Cir. 1935). This is not the case where the taxpayer 'satisfies' his interest obligation with additional borrowings from his original lender. The obligation as between the borrower and the lender remains but, like a note promising payment in the future, merely in another form. *Burgess* provides an opportunity for tax avoidance that § 163(a) clearly did not intend. Were we to find, as did the district court, that *Burgess* is here applicable, we would decline to follow it and disallow the Battelsteins' deductions.

REVERSED AND REMANDED FOR A CALCULATION OF TAX LIABILITY.

POLITZ, Circuit Judge, dissenting:

I respectfully dissent. The rejection of the *Burgess*[1] "exception" is not justified.

---

6. *Burgess* was followed in *Burck v. Commissioner*, 63 T.C. 556 (1975), *aff'd on other grounds*, 533 F.2d 768 (2d Cir. 1976), and again in *Wilkerson v. Commissioner*, 70 T.C. 240 (1978).

7. The exception has been much criticized. *See Burck v. Commissioner*, 533 F.2d 768, 770 n. 3 (2d Cir. 1976); *Goodstein v. Commissioner*, 267

F.2d 127, 131 (1st Cir. 1959); *Burgess v. Commissioner, supra*, 8 T.C. at 50–51 (Kern, J., dissenting for himself and five other Tax Court judges).

8. *See* note 3 *supra.*

1. *Burgess v. Commissioner*, 8 T.C. 47 (1947).

The majority opinion ascribes undue emphasis to the source of the funds used to make the interest payments, finding same came from the lender of the principal loan. A single factor should not dominate, but rather the totality of the circumstances should control deductibility of interest payments under 26 U.S.C. § 163(a). This decision hangs an ominous question mark over interest deductions in every instance in which a borrower secures, from the same lender, a subsequent loan equal to or greater than the interest paid in that tax year. I recognize that there must be very careful safeguards in this area or there will be abuses. But we need not hunt hummingbirds with shotguns.

I fully endorse the rules of law collated and enunciated by the majority to the effect that for an interest deduction to be allowed the payment must be in cash or its equivalent, a note alone, evidencing a future obligation is not enough, a sham exchange is to be ignored and a superficial payment structure created solely to reap undue benefits under § 163(a) is not to be given force and effect. However, the factual situation before us, as found by the Bankruptcy Judge and affirmed by the District Court is not inconsistent with these general rules and upon the facts so found (which are essentially not disputed) the interest deductions were appropriate and should be allowed.

My concern is heightened by the realization that if the taxpayers had borrowed the funds needed for the interest payments from another lender the deduction would probably not have been challenged, and if challenged, would apparently have been approved by the majority.

For over 30 years the *Burgess* explication of a particular application of § 163(a) has been a part of the jurisprudence. As the majority notes, it has been both followed and criticized. I believe it more worthy of support than criticism. The rule of *Burgess* and its progeny is of value and ought to be available to taxpayers in this circuit.

The material facts found by the Bankruptcy Court are not contested. Barry Battelstein and Jerry Battelstein entered into a loan agreement with Gibraltar Savings Association in January 1971 in order to finance the purchase and development of a piece of property. The Battelsteins and other owners intended to develop the property which, at time of purchase, did not have utilities. The Association agreed to make future loans to the owners to carry the cost of the property. In return the Association was to receive, in addition to repayment of its loans, a 19% interest in the net proceeds of sale of the property.

The loan agreement contained this salient language:

> After execution of the agreement Gibraltar will, pursuant to the terms thereof, from time to time, advance to Owners . . . an additional sum or sums of money equal to the Owners' actual out-of-pocket costs incurred and paid on said property subsequent to the execution of the agreement, including, but not being limited to debt services, taxes . . ."

The Association, pursuant to this provision, made subsequent advances (loans) to the owners, at higher interest rates than the original acquisition loan, with different maturity dates and secured by additional liens on the property. During 1973 and 1974 additional loans were made to the Battelsteins for sums equal to ad valorem taxes they paid and for debt service or interest charges they owed the Association and timely paid. The IRS challenged the deductibility of the interest payments and the ad valorem tax payments on the same grounds, that the source of the funds was the Association and thus no deduction could be taken because no payment had been made. The bankruptcy and district courts rejected the challenges to deduction of both the interest payments and the ad valorem tax payments. No appeal was taken to the rejection of the challenge to the deduction for ad valorem taxes. That issue leaves the case, presumptively because the IRS concluded that challenge was not well founded.

Jerry Battelstein claimed the interest deduction for both tax years at issue, 1973 and 1974. Barry Battelstein claimed the interest deduction for 1973 but capitalized the expense in 1974 under § 266 of the Internal Revenue Code.

These further facts were found. The Battelsteins were not obliged to borrow the additional sums from Gibraltar. Further, in each of the eight challenged instances of payment (quarterly during the two year period) they had sufficient funds in their general bank accounts (maintained with another institution, not Gibraltar) to cover the payments for interest and taxes or very ample resources from which the taxes and interest could have been paid. During the years 1973, 1974 and 1975 Jerry Battelstein's average monthly checking account balances were $24,000, $75,000 and $35,000, respectively. Barry Battelstein's monthly averages during those years were $36,000, $44,000 and $40,000. Jerry Battelstein's approximate net worth exceeded four million in 1973 and was over five million in 1974. Barry Battelstein had substantial assets upon which to draw for payments, for example in 1973 he had $1,300,000 in Certificates of Deposit readily available. The interest payments during the period fluctuated between $4,991.06 and $48,728.10. It cannot be gainsaid that the Battelsteins had adequate funds to pay the interest independent of the funds received from Gibraltar.

Another cogent consideration is whether the subsequent loans had any economic utility other than to serve as the basis of a claimed tax deduction. The trier of fact found that such utility existed. I fully agree. The loan agreement was intended to keep the Battelsteins and the other owners in a position where Gibraltar carried the full cost of acquisition and development of the property. The money was available. Jerry Battelstein testified that he subscribed to the theory that money could be made with borrowed money. This gave the Battelsteins added financial flexibility. And this must be viewed in light of the fact that Gibraltar would receive a 19% interest in the net proceeds of sale. These subsequent loans had an obvious economic utility.

The majority opinion assigns substantial import to the sequencing of checks between the Battelsteins and Gibraltar. It is said that in each instance the Battelsteins sent their respective checks for the quarterly interest payments at which point Gibraltar sent the Battelsteins a like check which the Battelsteins deposited in their general bank accounts. I find this significant, but reach a conclusion exactly opposite from that of the majority. When Gibraltar received the Battelsteins' checks there is more than simply the Battelsteins' promise to pay (such as would be evidenced by a note). They had indeed paid. The facts show that in some instances sufficient funds were on deposit in the Battelsteins' accounts to fully cover these checks and in every instance more than adequate resources existed for payment. Gibraltar sent its checks and they were deposited in the general bank accounts of the Battelsteins in another institution and commingled and utilized for whatever purpose. It cannot be claimed that the subsequent loan proceeds were used exclusively for payment of the quarterly interest payments for the facts do not support that conclusion.

The *Burgess* requirements, as subsequently refined, establish adequate safeguards to avoid the very real possibilities of abuse in dual loan transaction situations. In essence it is necessary that: (1) there be valid and legitimate reasons for the second loan other than to repay interest on the first loan, (2) proceeds of the second loan are commingled with the taxpayer's other funds, (3) the taxpayer have funds or available resources to cover the interest payment, and (4) the lending institution loses control of the proceeds of the second loan. *Burgess; Burck v. Commissioner*, 63 T.C. 556 (1975), aff'd on other grounds, 533 F.2d 768 (2d Cir. 1976); *Wilkerson v. Commissioner*, 70 T.C. 240 (1978).

The factual grounding of many "dual loan" cases precludes the taxpayer from

taking the deduction under *Burgess*, however the Tax Court has consistently recognized the rule's applicability in proper cases. *Heyman v. Commissioner*, 70 T.C. 482 (1978); *Alan A. Rubnitz*, 67 T.C. 621 (1977); *Nat Harrison Associates, Inc.*, 42 T.C. 601 (1964).[2]

I am convinced that all four of the above noted requirements are met in this case. I believe the *Burgess* test to be fair and workable. I would apply it. I see a vast difference between a carefully fashioned financial program, one intentionally designed to maximize valid tax advantages, and an artfully devised scheme to evade taxes. The latter is to be abrogated. To reject an instance of the former is a policy judgment only the Congress should make in the quest for tax reform.

For these reasons I would affirm the decisions of the bankruptcy and district courts allowing the interest deductions and I, therefore, respectfully dissent.

**2.** In *Goodstein v. C.I.R.*, 267 F.2d 127 (1st Cir. 1959), the First Circuit affirmed a Tax Court holding which characterized a transaction within the *Cleaver* mold, thereby denying the taxpayer the interest deduction. The court, somewhat cryptically said, "Taxpayer cites *Newton A. Burgess*, . . . which would *seem* to hold to the contrary but to us the reasoning of the dissenting members of the court is more persuasive." *Goodstein* at 131. This waffling rejection of *Burgess* should be scrutinized in light of the facts before the court. Both the Tax Court and the Court of Appeals determined the *Goodstein* transaction was devoid of economic substance beyond the purpose of obtaining an interest deduction. Indeed, the plan in that case was devised by an accountant who contacted the IRS to test whether the pre-conceived plan would result in a tax deduction. *Goodstein* is, therefore, distinguishable from the present case; it ignores the first noted test in the *Burgess* exception, perhaps because the transaction in that case was undeserving of the exception. In writing the *Burck* affirmance for the Second Circuit, Judge Oakes states in fn. 3 that he disagreed with the *Burgess* majority. Judge Oakes expressed these reservations "for himself only;" the *Burgess* rule was not the subject of review.