**Barry L. BATTELSTEIN and Jerry E. Battelstein, Plaintiffs–Appellees,**

v.

**INTERNAL REVENUE SERVICE, Defendant–Appellant.**

No. 77–3212.

United States Court of Appeals, Fifth Circuit.

Dec. 3, 1980.

M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Acting Chief, Appellate Section, Robert A. Bernstein, Gayle P. Miller, William Friedlander, Attys., Tax Div., Dept. of Justice, Washington, D.C., for defendant–appellant.

Marc E. Grossberg, David Cowan, Hugh M. Ray, Houston, Tex., for plaintiffs–appellees.

Before COLEMAN, Chief Judge, BROWN, AINSWORTH, GODBOLD,

CHARLES CLARK, RONEY, GEE, TJO-FLAT, HILL, FAY, RUBIN, VANCE, KRAVITCH, FRANK M. JOHNSON, Jr., GARZA, HENDERSON, REAVLEY, POL-ITZ, HATCHETT, ANDERSON, RAN-DALL, TATE, SAM D. JOHNSON, and THOMAS A. CLARK, Circuit Judges.*

FRANK M. JOHNSON, Jr., Circuit Judge:

This case arose out of Chapter XI petitions in bankruptcy filed by Barry L. Battelstein and Jerry E. Battelstein in the United States District Court for the Southern District of Texas. In the ensuing proceedings, the Internal Revenue Service (IRS) filed proof of claims against each. The Battelsteins objected to the claims and their objections were consolidated for trial. The bankruptcy judge denied the IRS claims after trial and the denial was affirmed by the district court. In response to an appeal filed by the IRS, a panel of this Court reversed the district court's decision denying the IRS claims and remanded the case to the district court for a calculation of tax liability. *Battelstein v. Internal Revenue Service*, 611 F.2d 1033 (5th Cir. 1980). The panel's decision was vacated when the Court granted the Battelsteins' petition for rehearing en banc. *Battelstein v. Internal Revenue Service*, 616 F.2d 253 (5th Cir. 1980). The case was taken under submission by the Court en banc following additional briefing by the parties.

The facts are not in dispute. As the panel opinion explained, the Battelsteins were land developers. Gibraltar Savings Association was their lender. In 1971, Gibraltar agreed to loan the Battelsteins more than three million dollars to cover the purchase of a piece of property known as Sharpstown. Gibraltar also agreed to make to the Battelsteins, if desired, future advances of the interest costs on this loan as they became due. The Battelsteins never paid interest except by way of these advances. Each quarter, Gibraltar would notify the Battelsteins of the amount of inter-est currently due. The Battelsteins would then send Gibraltar a check in this amount, and, on its receipt, Gibraltar would send the Battelsteins its check in the identical amount.

The controversy stems from the Battelsteins' deduction of the amount of these checks under authority of Internal Revenue Code § 163(a), 26 U.S.C. § 163(a). Section 163(a) allows cash basis taxpayers such as the Battelsteins to take a deduction for interest paid within the taxable year on indebtedness. The issue in this case is whether the Gibraltar–Battelstein check exchanges resulted in interest being paid within the taxable year. The bankruptcy judge and the district court decided that the exchanges had such a result. We conclude, as did the panel, that this decision was incorrect.

It is plain that the check exchanges relied on by the Battelsteins could not themselves extinguish the Battelsteins' interest obligations to Gibraltar. What happened at the time of each of the exchanges, as the Battelsteins now concede, is that the Battelsteins gave Gibraltar their note promising to·pay the amount of interest then due, plus interest, in the future. It is well established, however, that such a surrender of notes does not constitute the current payment of interest that Section 163(a) requires. The Supreme Court has repeatedly held, as long ago as 1931 and as recently as 1977, that payment for tax purposes must be made in cash or its equivalent. *Don E. Williams Co. v. Commissioner*, 429 U.S. 569, 577–78, 97 S.Ct. 850, 855–56, 51 L.Ed.2d 48 (1977); *Eckert v. Burnet*, 283 U.S. 140, 141, 51 S.Ct. 373, 374, 75 L.Ed. 911 (1931). *See also Battelstein v. Internal Revenue Service*, 611 F.2d at 1035 n.3 (citing additional cases). The 1977 decision explained that, "The reasoning is apparent: the note may never be paid, and if it is not paid, 'the taxpayer has parted with nothing more than his promise to pay.'" *Don E. Williams Co. v. Commissioner*, 429 U.S. at 578, 97 S.Ct. at 856. The Battelsteins attempted to

---

* Judge Jerre S. Williams has become a member of the Court since June 24, 1980, when this case was taken under submission. He does not wish to participate in the decision.

avoid such a characterization of their interest transactions here by adding to their surrender of notes the inconsequential exchanges of identical amount checks.[1] In ignoring these exchanges, we merely follow a well–established principle of law, viz., that in tax cases it is axiomatic that we look through the form in which the taxpayer has cloaked a transaction to the substance of the transaction. *See, e. g., Republic Petroleum Corp. v. United States,* 613 F.2d 518, 524 (5th Cir. 1980); *Redwing Carriers, Inc. v. Tomlinson,* 399 F.2d 652, 657 (5th Cir. 1968) (citing cases). As the Supreme Court stated some years ago in *Minnesota Tea Co. v. Helvering,* 302 U.S. 609, 58 S.Ct. 393, 82 L.Ed. 474 (1938), "A given result at the end of a straight path is not made a different result because reached by following a devious path." 302 U.S. at 613, 58 S.Ct. at 394. The check exchanges notwithstanding, the Battelsteins satisfied their interest obligations to Gibraltar by giving Gibraltar notes promising future payment. The law leaves no doubt that such a surrender of notes does not constitute payment for tax purposes entitling a taxpayer to a deduction.

As the panel concluded, the Battelsteins' reliance on the line of Tax Court cases beginning with *Burgess v. Commissioner,* 8 T.C. 47 (1947),[2] is misplaced, even assuming that the *Burgess* cases constitute good law. In the *Burgess* cases, the Tax Court was faced with situations in which taxpayers had obtained first one loan and then another from the same lender, and then had attempted to claim a deduction for interest paid on the first loan, even though the interest was possibly paid with funds obtained as part of the second loan. Under the Code, a taxpayer may be entitled to a deduction in such a situation only if the second loan was not for the purpose of financing the interest due on the first loan. If the second loan was for the purpose of financing the interest due on the first loan, then the taxpayer's interest obligation on the first loan has not been paid as Section 163(a) requires; it has merely been postponed.[3] In many cases, it is not apparent what the purpose of a subsequent loan was— whether it was to finance the interest payments on a previous loan for which deductions are being claimed, or whether it was to fulfill some other unrelated objective. In the *Burgess* cases, the Tax Court attempted to establish a formula to be used in making such a determination.[4] The formula has been subject to criticism for being too easy to manipulate by taxpayers and thus as unduly inviting tax evasion. Whether or not this criticism is valid, it is clear that it is unnecessary to apply the formula here, or that if applied here in light of its purpose it could yield only one result. This is because the subsequent loans made by Gibraltar to the Battelsteins–the checks issued by Gibraltar to the Battelsteins as part of the check exchanges, in the exact amount of the Battelsteins' current interest obligations–were plainly for no purpose oth-

1. The Battelsteins do not assert, nor do we find it possible to infer, any other purpose for the check exchanges.

2. In addition to *Burgess,* see *Burck v. Commissioner,* 63 T.C. 556 (1975), *aff'd on other grounds,* 533 F.2d 768 (2d Cir. 1976), and *Wilkerson v. Commissioner,* 70 T.C. 240 (1978).

3. In other words, the obligation as between the taxpayer and the lender remains but–like a note promising payment in the future, which does not qualify for a deduction, *see supra* –merely in another form. Compare the situation in which a taxpayer borrows money from a certain lender, and then borrows money from a third party in order to pay the original lender the interest. In such a situation the interest is considered paid and deductible because the obligation as between the taxpayer and the origi-

nal lender has not been postponed, it has been extinguished. *See, e. g., Crain v. Commissioner,* 75 F.2d 962, 964 (8th Cir. 1935); *McAdams v. Commissioner,* 15 T.C. 231, 235 (1950).

4. In *Burgess* and its progeny, the Tax Court held that interest may be considered paid even though the taxpayer may have paid it with money subsequently borrowed from the initial lender, so long as *the money subsequently borrowed actually passed into the hands or bank account of the taxpayer, was commingled with other funds of the taxpayer and thus became subject to the taxpayer's unrestricted control. Burgess v. Commissioner,* 8 T.C. at 49–50. *See also Wilkerson v. Commissioner,* 70 T.C. at 257–61; *Burck v. Commissioner,* 63 T.C. at 559–60.

er than to finance the Battelsteins' current interest obligations to Gibraltar. *See* note 1, *supra*. Even under *Burgess*, the Battelsteins' check exchanges cannot be said to have resulted in the payment of interest required for a deduction by Section 163(a).

In announcing our decision, we note that, contrary to what has been suggested, neither the Court nor, for that matter, the panel has considered the Battelsteins' 'entrepreneurial style' to be an issue in this case. For business men to defer payment of interest obligations in the way the Battelsteins have done may well be a sensible way in which to do business. Whether it is or is not, what is relevant here is that interest obligations so deferred cannot be claimed for tax purposes as interest obligations paid. Under the Code, cash basis taxpayers such as the Battelsteins are entitled to a deduction for interest paid on indebtedness only if that interest is paid within the taxable year. The Battelsteins simply do not qualify.

We note further that even were this Court of the opinion that there are, as has been suggested, equitable considerations in this case favoring the Battelsteins, it has long been established that we may not allow such considerations to play a part in our decision. As panels of this Court have recently had occasion to reiterate, citing recent and established Supreme Court precedent, tax deductions are matters of legislative grace and must be narrowly construed. The taxpayer bears the burden of proving his entitlement to a particular deduction. Equity cannot supply a deduction when the Code does not grant one. *See, e. g., Lettie Pate Whitehead Foundation v. United States*, 606 F.2d 534, 539 (5th Cir. 1979); *C.A. White Trucking Co. v. Commissioner*, 601 F.2d 867, 869 (5th Cir. 1979).

The only question before us is whether the Battelsteins' check exchange scheme resulted in the payment of interest Section 163(a) requires. A review of the scheme under the familiar standards of appraisal mandated by the Supreme Court permits no conclusion other than that no interest was paid, and thus that no deduction may be allowed.

REVERSED AND REMANDED FOR A CALCULATION OF TAX LIABILITY.

POLITZ, Circuit Judge, with whom BROWN, RONEY, GEE, JAMES C. HILL, FAY, VANCE, GARZA, REAVLEY and RANDALL, Circuit Judges, join, dissenting:

Respectfully, I dissent. The Battelstein loan arrangement is precisely the type of transaction covered by the *Burgess* rule.[1] In 1971 the Battelsteins borrowed in excess of three million dollars from the Gibraltar Savings Association to finance the Sharpstown project. They took additional loans from Gibraltar in 1973 and 1974. It is beyond dispute that a § 163(a) deduction is not available to the Battelsteins if notes alone, rather than cash or its equivalent, were given in payment of the accrued interest on the initial loan. But I cannot agree with the narrow characterization of this overall transaction as a paper shuffling sham composed of surrendered notes with check exchanges flying CAP. By declining to apply and raising the spectre of criticism of *Burgess*, the majority registers its objection to a 33 year old tax law precedent which is both logical and meritorious. I believe this rejection unjustified.

There is no question but that the § 163(a) interest deduction may be claimed in instances in which the interest is paid with the proceeds of a loan. If the Battelsteins had borrowed the money to pay the interest to Gibraltar from a different lender, no challenge would apparently be made to the interest deduction. It is only because the Battelsteins secured additional loans from Gibraltar, equal to the interest paid, that they forfeit the deduction. It is this dimension of the majority opinion with which we take issue, and for which the *Burgess* rule is particularly appropos. Its rejection causes the taxpayers of this circuit to run through

---

1. *Burgess v. Commissioner*, 8 T.C. 47 (1947); as subsequently refined, *Burck v. Commission-* er, 63 T.C. 556 (1975), and *Wilkerson v. Commissioner*, 70 T.C. 240 (1978).

a legal minefield they ought not have to cross. Today's decision portends the day when the § 163(a) deduction is put in jeopardy whenever a taxpayer borrows from a lender a sum at least equal to the interest paid that same lender that tax year.

It is not difficult to envision completely unacceptable consequences of the rule of this case. Let us suppose that a homeowner/taxpayer has a $30,000 mortgage required $300 monthly payments of principal and interest. Let us also suppose that he has an automatic $1,000 line of credit available if he should overdraw his personal account. The mortgage loan and the checking account, with the the protective line of credit, are with the same bank. Let us further suppose that at various times during the year our hypothetical taxpayer either owes up to $1,000 or has several thousands of dollars on demand deposit, depending on transitory seasonal fluctuations. Throughout the entire year his assets exceed $100,000 which, for his own reasons, he chooses not to liquidate during the "deficit" periods but opts to rely on borrowing in order to maintain financial flexibility. Under today's decision the deductibility of the mortgage interest is endangered because funds drawn on the line of credit may have been used to make the monthly mortgage payments. The risk is created simply because both loans came from the same lender. Proper application of the *Burgess* rule would assure this taxpayer safe passage.

The only credible distinction between the Battelsteins' predicament and that of our hypothetical taxpayer is that the former is structured and the latter is not. The Battelsteins appear to have designed their transaction to conform with existing case law and regulatory precedents. Our hypothetical taxpayer is in a quite common situation very probably affecting a substantial number of taxpayers. I am compelled to the conclusion that the Battelsteins are being penalized for trying to carefully fashion a tax–oriented transaction designed to maximize tax advantages. Surely this effort is not proscribed. As was cogently observed by the eminent jurist Judge Learned Hand, "a transaction otherwise within an exception of the tax law, does not lose its immunity, because it is actuated by a desire to avoid, or, if one choose, to evade, taxation. Anyone may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes." *Helvering v. Gregory,* 69 F.2d 809, 810 (2d Cir. 1934), affirmed 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935).

The *Burgess* formulation, which I believe should govern disposition of this case, is a time tested amalgamation of various factors that aid courts in determining whether a taxpayer is perpetrating a dual loan transaction sham or is legitimately entitled to the interest deduction. To qualify for the tax deduction under the *Burgess* test it is necessary that: (1) there be valid and legitimate reasons for the second loan other than to repay interest on the first loan, (2) proceeds of the second loan are commingled with the taxpayer's other funds, (3) the taxpayer have funds or available resources to cover the interest payment, and (4) the lending institution loses control of the proceeds of the second loan. *Burgess; Burck v. Commissioner,* 63 T.C. 556 (1975), aff'd. on other grounds, 533 F.2d 768 (2d Cir. 1976); *Wilkerson v. Commissioner,* 70 T.C. 240 (1978).

Factor one is satisfied because valid reasons existed for the subsequent loans, other than merely making interest payments on the first loan. Funds were required to finance development of the Sharpstown project which was a multi–million dollar long–range venture; roads were not in, utilities were not installed. The controversial subsequent loan agreement was really a clause contained in the Battelstein–Gibraltar loan accord that stated:

After execution of the agreement Gibraltar will, pursuant to the terms thereof, from time to time, advance to Owners ... an additional sum or sums of money equal to the Owners' actual out–of–pocket costs incurred and paid on said property subsequent to the execution of the

agreement, including, but not being limited to debt services, taxes . . .

In return for this long–term financing clause, Gibraltar was to be repaid the loans plus interest and receive a 19% interest in the net proceeds when the land was sold.[2] Jerry Battelstein was eager to obtain this type of financing because it did not tie up his own liquid assets; he testified that he firmly believed an astute businessman could make money with borrowed money. Advances were in fact made to the Battelsteins in 1973 and 1974 for sums equal to the ad valorem taxes paid on the land and for debt service or interest owed to Gibraltar on the initial loan.

It is clear that the subsequent loans were intended to place the full cost of acquisition and development of the Sharpstown property on Gibraltar in order to give the Battelsteins added financial flexibility. The majority's position focuses, in isolation, on the funds borrowed to pay interest charges on the first loan. No mention is made of the funds borrowed to pay the ad valorem taxes, the payment of which had been originally rejected as a deduction by the I.R.S. for the same reason, i.e., the funds used for payment had been borrowed from Gibraltar. This focusing obscures the business purpose of the subsequent loans, the underwriting of all "out–of–pocket" expenses associated with the Sharpstown parcel.

Factors (2) and (3) of Burgess are met. Proceeds of the second loan were commingled with personal Battelstein funds in their bank accounts (which were not with Gibraltar). Additionally, in each of the eight challenged instances of payment (quarterly during the two–year period under scrutiny) the Battelsteins had ample assets to cover taxes and interest payments independent of the subsequent loan proceeds. During the years 1973, 1974 and 1975, Jerry Battelstein's average monthly checking account balances were $24,000, $75,000 and $35,000 respectively. Barry Battelstein's monthly averages during those

years were $36,000, $44,000 and $40,000. Jerry Battelstein's approximate net worth exceeded four million dollars in 1973 and was over five million in 1974. Similarly, Barry Battelstein had substantial assets upon which to draw for payments. For example, in 1973 he had $1,300,000 worth of Certificates of Deposit that could have been liquidated to pay accruing ad valorem taxes and interest charges on the first loan. During the years in question accruing interest paid with funds borrowed under the second loan accord fluctuated between $4,991.06 and $48,728.10. It cannot be disputed that the Battelsteins had more than adequate funds to pay the quarterly interest, independent of any monies received on later advances from Gibraltar.

Finally, Burgess requires that Gibraltar relinquish total control of the questioned loan proceeds. From the majority's perspective, the sequencing of checks between the Battelsteins and Gibraltar conclusively proved that the bank's control of these funds was not extinguished because an "inconsequential exchange of surrendered notes" occurred rather than a cash payment of interest. Emphasis is placed on the fact that the Battelsteins first sent their checks for the quarterly interest payments at which time Gibraltar sent the Battelsteins a like check which they deposited in their general bank accounts. I find this significant, but reach a conclusion exactly opposite from that of the majority. Upon receipt of the Battelsteins' check, Gibraltar had made more than a mere promise to pay (such as would be evidenced by a note). When Gibraltar received the checks the Battelsteins had paid. Had Gibraltar chosen for some reason not to loan an amount equal to the particular payment, the Battelsteins would have been obliged to see that the check was honored out of their own substantial personal funds. Sending those checks was the equivalent of sending cash. The record reflects that in some instances the funds on deposit when Gibraltar re-

2. Interest rates and due dates on the subsequent loans differed from those on the first loan.

ceived the checks were sufficient to cover the checks before Gibraltar made any further loan; and in every instance, the Battelsteins had more than adequate resources available. The record also reflects that in some instances the check to Gibraltar was debited before the proceeds from the Gibraltar check were deposited.

It is apparent that in many, if not most "dual loan" cases the *Burgess* requirements would preclude the taxpayer from taking the interest deduction. That is all the more reason to support the application of *Burgess* in a proper case. I view this as just such a case. The Tax Court continues to support the rule in appropriate cases.[3] *Heyman v. Commissioner*, 70 T.C. 482 (1978); *Alan A. Rubnitz*, 67 T.C. 621 (1977); *Nat Harrison Associates, Inc.*, 42 T.C. 601 (1964).

The majority opinion occasions further comments which perhaps might best be stated in the form of inquiries. Setting aside for the moment the permutation of cash versus accrual basis and date of crediting in determining taxable income we inquire, in general terms, about the tax posture of Gibraltar. What may we safely assume to be the position of the I.R.S. as respects the Battelsteins' interest payments? Was that reportable income to Gibraltar? When did it become so? May Gibraltar insist that it did not receive the interest payments due on the initial loan because it made other loans at different rates of interest and with different due dates?

Viewing the total transaction from the standpoint of the Battelsteins we must also inquire. The development envisioned the sale of the property, presumably at a hand-

some profit. One would assume that was the early expectation. What would have been the position of the I.R.S. had the Battelsteins borrowed from Gibraltar (and other institutions) all sums necessary to make the quarterly interest payments over a several year period, and timed or extended the subsequent loans so that all came due in the year of the sale, to be used in a lump sum against the profit realized? One need hardly doubt the reception that program would have gotten.

The essential predicate for the majority opinion is that the subsequent loans came from the same lender. How far do we extend the "sameness"? What about a loan from a subsidiary or affiliated lending institution or from a sibling bank which happens to be a member of the growing bancshare–type organization? Will we not be compelled to articulate a *Burgess* type rubric?

I am convinced beyond peradventure that the *Burgess* test is applicable to this case and should be endorsed. I would affirm the decisions of the bankruptcy court and the district court allowing the interest deduction. I therefore respectfully DISSENT.

---

**3.** In *Goodstein v. C.I.R.*, 267 F.2d 127 (1st Cir. 1959), the First Circuit affirmed a Tax Court holding which characterized a transaction within the *Cleaver* mold, thereby denying the taxpayer the interest deduction. The court, somewhat cryptically said, "Taxpayer cites *Newton A. Burgess*, ... which would *seem* to hold to the contrary but to us the reasoning of the dissenting members of the court is more persuasive." *Goodstein* at 131. This waffling rejection of *Burgess* should be scrutinized in light of the facts before the court. Both the Tax Court and the Court of Appeals determined the *Goodstein* transaction was devoid of eco-

nomic substance beyond the purpose of obtaining an interest deduction. Indeed, the plan in that case was devised by an accountant who contacted the IRS to test whether the pre–conceived plan would result in a tax deduction. *Goodstein* is, therefore, distinguishable from the present case; it ignores the first noted test in the *Burgess* exception, perhaps because the transaction in that case was undeserving of the exception. In writing the *Burck* affirmance for the Second Circuit, Judge Oakes expressed these reservations "for himself only;" the *Burgess* rule was not the subject of review.