RUBIN A. FRANCO AND PHYLLIS G. FRANCO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Franco v. Commissioner
Docket No. 25146-89
United States Tax Court
T.C. Memo 1992-577; 1992 Tax Ct. Memo LEXIS 599; 64 T.C.M. (CCH) 928; September 28, 1992, Filed *599 Decision will be entered for respondent. For Petitioners: Gerald W. Hartley and H. Byron Carter III. For Respondent: J. Craig Young and Donald R. Gilliland. SCOTT SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' Federal income tax for the calendar years 1980, 1984, and 1985 in the amounts of $ 1,663, $ 708, and $ 20,505, respectively. The issues for decision are: (1) whether petitioners are entitled to a deduction under section 166[1] as a bad debt of amounts Mr. Franco borrowed from lenders to his corporations for the expressed purpose of satisfying his guarantor obligations of the corporate debts, and (2) if petitioners are entitled to a bad debt deduction, is the deduction for a business or nonbusiness bad debt. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Rubin A. Franco and Phyllis G. *600 Franco resided in Montgomery, Alabama, at the time the petition in this case was filed. They filed joint Federal income tax returns for the calendar years 1980, 1984, and 1985. Petitioners kept their records and reported their income on the cash basis method during all periods here relevant. During the years in issue and for sometime prior thereto, Mr. Franco (petitioner) was engaged in the business of selling new and used coin-operated vending machines and video game machines through two corporations, Franco Distributing Co. (Franco) of Montgomery, Alabama, and Greater Southern Distributing Co. (Greater Southern) of Atlanta, Georgia. During all times here relevant, petitioner served as president and chairman of the board of Franco and secretary/treasurer, as well as a director, of Greater Southern. He had been employed by Franco since he finished college in 1950. Franco was founded by petitioner's father. The shareholders received substantial dividends from the corporations during the 1970s and early 1980s. In 1985, petitioner had a stock interest in Franco of 28.33 percent. The same percentage was held by each of petitioner's two sisters. The shareholders' children owned *601 the remaining interest in Franco. One of petitioner's sisters was married to Joseph E. Capilouto and the other to Morris R. Piha. Mr. Capilouto and Mr. Piha were employed by Franco or related companies and had been so employed during most of their working lives. In 1985 petitioner, Mr. Capilouto, and Mr. Piha each owned 22.8-1/3 percent of the stock of Greater Southern, with the balance owned by their children. Prior to 1985 a small amount of the Greater Southern stock had been owned by an unrelated individual. For convenience, petitioner, Mr. Capilouto, and Mr. Piha will be collectively referred to as "the shareholders" of each corporation. Franco and Greater Southern were equal general partners in an Alabama partnership, Southern Financial Services (Southern Financial). Franco and Greater Southern both sold vending and video game machines on installment sales contracts. The sales were made to dealers who would in turn lease the machines to various public and private establishments for use by the public. The leasing arrangement typically called for the dealers to receive a commission based on usage of the machines. Franco and Greater Southern would sell the installment *602 sales contracts at a discount to various lending institutions in order to obtain operating funds to purchase more equipment. The dealers who purchased the machines originally from Franco or Greater Southern became primarily liable to the lending institutions on the assigned contracts. However, the lending institutions required, as a condition to purchasing the contracts, full recourse in the form of guaranties from Franco and Greater Southern as well as personal guaranties of the indebtedness by the shareholders of the corporations. Franco and Greater Southern also sold installment sales contracts at a discount to Southern Financial. Southern Financial would, like the distributing companies, pledge the installment contracts to other lending institutions. The lending institutions would require the same corporate and personal guaranties of these contracts as they required with respect to the contracts acquired from Franco and Greater Southern. As a result, between 1979 and 1984, the shareholders were required to execute a series of loan guaranties for Franco, Greater Southern, and Southern Financial. An economic downturn in the business of Franco and Greater Southern occurred *603 in 1983 which became worse in 1984 and 1985. With the advent of home video equipment, the demand for video machines in public places declined. The dealers found themselves unable in many instances to collect their respective percentages from the lessees. As the payment records of the dealers continued to deteriorate, Franco and Greater Southern, as well as Southern Financial, were required to honor their recourse obligations. In 1985 the companies became at times unable to honor their recourse obligations and the lending institutions approached the shareholders with respect to complying with their guarantor obligations. Union Bank and Trust Co. (Union), Central Bank of the South (Central), and Firestone Financial Services (Firestone), were the primary lending institutions which had purchased installment contracts from Franco, Greater Southern, and Southern Financial. In the fall of 1984, the potential debt of the corporations to Central approached $ 3,000,000. Central determined that the debt was undercollateralized to the extent of $ 1.7 million. The corporations were unable to provide additional collateral and Central turned to the shareholders to satisfy their guarantor *604 obligations. Central notified the shareholders by letter dated March 28, 1985, that they must comply with their guarantor obligations by remitting the sum of $ 900,000. On April 1, 1985, Central loaned the shareholders $ 925,000 representing the approximate amount called by the bank pursuant to the guaranties. Both the loan application and the loan agreement contained a stipulation that the proceeds of the loan were to be used to pay the debts of Southern Financial and Greater Southern. On April 1, 1985, the shareholders gave Central a note for $ 925,000 and Central issued a check for $ 925,000 payable to the shareholders jointly. The shareholders endorsed and deposited the check in petitioner's agent account at Union. On April 2, 1985, petitioner wrote a check drawn from the agent account at Union in the amount of $ 890,104.63 payable to Southern Financial which, in turn, remitted that amount to Central. The difference between the $ 925,000 loan and the $ 890,104.63 check was used to pay a Franco customer's obligation guaranteed by Franco. The shareholders further collateralized the $ 925,000 loan with four pieces of real estate and $ 220,000 in certificates of deposit. Based *605 on the long-term relationship, the officers of Central had confidence in the integrity of the shareholders of Franco and Greater Southern. The Central officers dealing with petitioner and the other shareholders were never concerned that the shareholders might withdraw the loan proceeds and expend them for some unrelated purpose, leaving the guarantor debt unpaid. If the shareholders had done so, they would have violated the terms of the loan agreement and Central would have promptly commenced legal action against them or foreclosed upon the collateral. The shareholders never had any intention to use the loan proceeds for any purpose other than to pay the guarantor debt due Central. They were aware that had they not used the loan proceeds to pay off the guarantor debt, Central could have foreclosed on the collateral. The shareholders were guarantors on a loan made by Firestone to Franco on December 7, 1979. On July 10, 1985, the shareholders executed a second guaranty for the benefit of Firestone on Franco's behalf and in addition executed a separate guaranty on behalf of Greater Southern. Firestone also began to experience significant defaults on contracts purchased from the *606 corporations. In the fall of 1985, the shareholders met with Firestone's representatives to discuss the matter. The shareholders informed Firestone that they lacked the ready cash to pay the guaranteed debt in full. However, they were willing to borrow the money personally from Firestone and use the proceeds to pay off the debt. The shareholders informed Firestone that they would be able to pay off their direct debt in installments. Firestone notified the shareholders by letter dated September 24, 1985, that they must comply with their guarantor obligations by remitting the sum of $ 394,436.23. A second letter of the same date proposed that this debt be paid by the shareholders in monthly installments over a 24-month period. On that same day, Firestone loaned the shareholders $ 394,436.23 and issued checks for $ 131,478.74 to each shareholder. The shareholders gave Firestone their personal note for $ 394,436.23. Both Firestone and the shareholders understood that this loan was to pay the amount called by Firestone on the shareholders' guaranty. Petitioner deposited his check in his personal checking account at Union. On September 27, 1985, petitioner remitted a personal *607 check to Firestone in the amount of $ 131,478.74 drawn on his personal account at Union and each of the other shareholders sent Firestone his personal check in the same amount. By late 1985, 24 contracts purchased by Union from Franco were at least 90 days past due. The total amount of the 24 contracts was over $ 500,000. Both Union and Franco attempted to collect on these contracts. When unable to collect, Union approached the shareholder guarantors. Union notified the shareholders by letter dated November 6, 1985, that they must comply with their guarantor obligations by remitting the sum of $ 515,481.33. On December 20, 1985, Union loaned the shareholders $ 521,230.90 representing the amount then owed by them under the guaranties. The shareholders gave their personal note for $ 521,230.90 to Union. On December 24, 1985, Union disbursed a check for $ 515,481.33 payable to the shareholders jointly. The shareholders redeposited the check with Union and Union then credited petitioner's personal account at that bank with $ 173,743.63 and also credited the personal account of Mr. Capilouto at that bank with an equal amount. An account under the name of "Piha", but not Mr. Morris *608 R. Piha's account, was incorrectly credited with $ 173,743.63, but Union corrected the mistake and credited this $ 173,743.63 amount to payment of the Franco loan guaranteed by the shareholders. On December 30, 1985, petitioner remitted a personal check to Union in the amount of $ 173,743.63 drawn on his personal account at Union and on December 27, 1985, Mr. Capilouto remitted his personal check to Union in the same amount. As part of the loan agreement, Union assigned to the shareholders its rights under the defaulted 24 contracts. The shareholders immediately assigned those contracts back to the bank as security for the loan. However, Union considered the 24 contracts to be of little value. Union also had two existing commercial real estate mortgages on property in Montgomery, Alabama, owned by the shareholders and their wives. These mortgages each had a "spreader" clause under which the property secured any other debt owed to Union by the shareholders. Union held no other security for the December 20, 1985, loan. Based on his long-term relationship with the shareholders, the officer of Union primarily responsible for monitoring relationships between Franco and Union was *609 never concerned that the shareholders might withdraw the loan proceeds and expend them for some unrelated purpose, leaving the guarantor debt unpaid. If the shareholders had done so, the bank would have commenced legal action against them. Union considered the notes given by the shareholders under the December 1985 loan transaction as a means for payment of the guarantor debts. Petitioner and the other shareholders took out the personal loans to pay the guarantor obligations because they lacked sufficient liquid assets in 1985 to pay the guarantor debts in cash although their net worth was more than the indebtedness. Mr. Mike Butler, a certified public accountant and certified financial planner, has performed tax and accounting services, including preparation of tax returns, for Franco, Greater Southern, and Southern Financial, since around 1978. The shareholders consulted Mr. Butler and an attorney, Mr. Gerald Hartley, in connection with the transactions with Central, Firestone, and Union and were told by both that they must get the loan proceeds in their possession and control in order to be able to claim a bad debt deduction. The exchange of checks with the creditors occurred, *610 at least in part, to allow the shareholders to claim that they had "paid" the corporate debts. Mr. Butler prepared audited financial statements and balance sheets for the corporations for 1985 and the years preceding and following 1985. All of the balance sheets prepared by Mr. Butler were based solely on the book value of assets. The balance sheet of Franco for its fiscal year ended June 30, 1985, indicated that Franco had a book value of $ 78,865. However, the financial statement indicated that this amount did not take into account large contingent recourse liabilities to the lending institutions. The other financial statements contained in the record also reported large contingent recourse liabilities. Book value as shown on the corporate balance sheets was based solely on tangible assets and did not take into account the value of intangible assets such as goodwill or going-concern value. In 1985 Franco, Greater Southern, and Southern Financial did not show on their financial statements an indebtedness to the shareholders for the amounts of the guarantor obligations the shareholders had been required to pay. Petitioners claimed a business bad debt deduction of $ 613,556 *611 on their 1985 joint Federal income tax return. The amount of the claimed deduction was computed as follows: Firestone:
$   394,436
Central Bank:
925,000
Union Bank:
521,231
SUBTOTAL:
$ 1,840,667
X 1/3
TOTAL:
$   613,556
Respondent in the notice of deficiency disallowed this claimed deduction. OPINION Section 166 provides for the deduction of any debt which becomes worthless within the taxable year. [2] In the case of a taxpayer other than a corporation, a nonbusiness bad debt is deductible only as a loss from the sale or exchange during the taxable year of a capital asset held not more than 6 months. A nonbusiness bad debt is a debt other than one created or acquired in connection with a trade or business of the taxpayer or a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. *612 In the present case respondent takes the position that petitioner is entitled to no bad debt deduction in the year 1985 since he did not pay the corporate debts of Franco and Greater Southern in those years but merely gave a note for the amounts of the debts to the same lending institutions that had lent the money to the corporations and to which he was obligated as a guarantor. Respondent further contends that if petitioner is considered to have paid the corporate debts, the payments should be treated as indirect capital contributions to the corporations rather than as payment of indebtedness. Respondent further contends that if debts from the corporations arose in petitioner's favor as a result of payments on the corporate debts, petitioner has not shown that those debts were worthless at the end of 1985. Finally, respondent contends that any bad debts resulting from petitioner's payment of the corporate debts were nonbusiness rather than business bad debts. Petitioner contends that he did, in fact, pay the debts of Franco and Greater Southern in 1985 and that this was done by way of the checks he gave to the lending institutions from money he borrowed from those institutions. *613 Petitioner argues that he had control over the funds lent to him by the institutions who lent him the funds to pay the guarantor liabilities for Franco and Greater Southern, and that because of this fact, he did, in fact, pay the debts. Petitioner further contends that the payments were not indirect capital contributions and that the resulting debts to him from the corporations have been shown to be worthless at the end of 1985. Petitioner argues that he paid the indebtedness to preserve his salary from the corporations and, therefore, the indebtedness was paid in connection with his trade or business and is deductible as business bad debts. The only year involved in the claimed bad debt deduction is 1985. The deficiencies in the years 1980 and 1984 resulted from allowances of loss carrybacks claimed by petitioner for those years as a result of the deduction in 1985. A cash basis taxpayer is not entitled to a bad debt or loss deduction unless he has made an outlay of cash or property having a cash value in payment of the debt or obligation. Where a note is given to the financial institution by a guarantor of a debt in payment of that debt the guarantor has not paid the debt *614 if he reports his income on the cash basis until a cash payment is made on the note. Helvering v. Price, 309 U.S. 409 (1940); Eckert v. Burnet, 283 U.S. 140 (1931). It is equally as well settled that the substitution of the guarantor's personal note for the note of the prime obligor in satisfaction of the liability as guarantor does not constitute an outlay of cash until the note is actually paid. Perry v. Commissioner, 49 T.C. 508 (1968). When a cash basis taxpayer gives a note in payment of a guarantor indebtedness, it is not considered a payment of a debt until payment is made on the note even though the guarantor note is secured by property of the guarantor in addition to the property securing the indebtedness guaranteed. Perry v. Commissioner, supra at 522. However, payment may be made with borrowed funds which will give rise to a deduction to a cash basis taxpayer if the funds are borrowed from an institution other than the institution to which payment is made. McAdams v. Commissioner, 15 T.C. 231 (1950), affd. 198 F.2d 54 (5th Cir. 1952). *615 We have also held that payment made with borrowed funds will give rise to a deduction to a cash basis taxpayer of an otherwise deductible item when the lender retains no control over the loan proceeds. Crown v. Commissioner, 77 T.C. 582, 593 (1981); Burgess v. Commissioner, 8 T.C. 47 (1947). Respondent argues that the instant case is controlled by the case of Battelstein v. Internal Revenue Service, 631 F.2d 1182 (5th Cir. 1980). An appeal in this case lies to the Eleventh Circuit which has held that decisions of the United States Court of Appeals for the Fifth Circuit handed down by that court prior to the close of business on September 30, 1981, shall be binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981). Battelstein v. Internal Revenue Service, supra, involved taxpayers who had borrowed money to develop some property with the understanding that future advances would be made of the interest costs of the loan as interest payments became due. The taxpayers never *616 paid interest except by way of such advances. Each quarter the lending institution would notify the taxpayers of the amount of interest currently due. The taxpayers would send the lending institution a check in this amount, and on its receipt the lending institution would send the taxpayers its check in an identical amount. The taxpayers would give the lending institution their note promising to pay the amount of interest then due, plus interest on the amount in the future. The Fifth Circuit in Battelstein pointed out that the Supreme Court has repeatedly held that payment for tax purposes must be made in cash or its equivalent, quoting from Don E. Williams Co. v. Commissioner, 429 U.S. 569, 578 (1977). The court stated that the reason underlying not allowing a deduction to a cash basis taxpayer when a note is given in payment of the amount due is that the note may never be paid and, if it is not paid, the taxpayer has parted with nothing more than his promise to pay. The Fifth Circuit in the Battelstein case stated that nothing was in substance added to the transactions involved in that case by the taxpayers adding to their surrender of *617 notes the inconsequential exchange of checks in identical amounts. The court in Battelstein v. Internal Revenue Service, supra at 1184-1187, discussed Burgess v. Commissioner, supra, and stated that the reliance of the taxpayer on the Burgess case was misplaced, pointing out that under the holding in Burgess a taxpayer may be entitled to a deduction in a situation where funds have been borrowed from the same lender to which they are paid only if the second loan was not for the purpose of financing the interest due on the first loan. The court concluded that the second loan to the taxpayers in Battelstein was for the purpose of financing the interest due on the first loan. In footnote 4 in the Battelstein case, the Circuit Court stated: In Burgess and its progeny, the Tax Court held that interest may be considered paid even though the taxpayer may have paid it with money subsequently borrowed from the initial lender, so long as the money subsequently borrowed actually passed into the hands or bank account of the taxpayer, was commingled with other funds of the taxpayer and thus became subject *618 to the taxpayer's unrestricted control. Burgess v. Commissioner, 8 T.C. at 49-50. See also Wilkerson v. Commissioner, 70 T.C. at 257-61; Burck v. Commissioner, 63 T.C. at 559-60. The Circuit Court in Battelstein v. Internal Revenue Service, supra at 1184-1185, stated that it was unnecessary to apply the Burgess case to the situation there present because the facts before it were clear that the subsequent loans made by the lending institution to the taxpayers were plainly for no purpose other than to finance the taxpayers' current interest obligations. The parties in the instant case stipulated that the amounts claimed as bad debt deductions were amounts paid by petitioner to Firestone, Central, and Union "with the funds borrowed for that express purpose from those same creditors." It is, therefore, clear here from the stipulation as well as the other facts in the record that the loans made to petitioner were plainly for no purpose other than paying the guarantor obligations of petitioner to the lending institutions. Therefore under the Battelstein *619 case, the giving of the notes and the checks cannot be said to have resulted in the payment of the guarantor liability. While it is clear under Battelstein that the transactions here would not result in a payment of the guaranties, this record also shows that petitioner never had unrestricted control over the funds from the loans used to pay his guarantor liability within the holdings of Burgess v. Commissioner, supra, and more recent cases such as Menz v. Commissioner, 80 T.C. 1174, 1187 (1983). In the Menz case we stated that from an analysis of the numerous cases involving claimed deductions by cash basis taxpayers where payment was made by a note it seemed that deductibility turns on whether the taxpayer exercises "unrestricted control" over the money borrowed from the same lender. In that case we concluded that -- Where a lender gives up control of borrowed funds, the funds are commingled with the taxpayer's other funds in an account at an institution separate from the lender, and the interest obligation is satisfied with funds from that separate account, there has been a payment of interest under section *620 163(a). [Citations omitted.] Menz v. Commissioner, supra at 1187. In the Menz case we pointed out the criticism of the Burgess case made in Battelstein v. Internal Revenue Service, 631 F.2d 1182 (5th Cir. 1980), and stated that the court in Battelstein, as well as in Wilkerson v. Commissioner, 655 F.2d 980 (9th Cir. 1981), revg. 70 T.C. 240 (1978), had considered that the unrestricted control standard standing alone was insufficient if the funds had been borrowed from the same lender for the primary purpose of financing interest on a prior loan. In the instant case, we conclude that the facts show that petitioner never had unrestricted control of the funds borrowed. In the case of the funds borrowed from Central, the loan application and loan agreement contained a stipulation that the proceeds of the loan were to be used to pay the debt of Southern Financial and Greater Southern to Central. Therefore, although funds were deposited by petitioner in an account at a different institution, Union, that did not cause those funds to leave the control *621 of Central since the purpose for which the funds were loaned was recited in both the loan application and the loan agreement. In other words, by contract petitioner had agreed to use the funds loaned to pay the guarantor obligations. Therefore, as a legal matter petitioner never had unrestricted control of the funds. Also, it is clear that the small amount of the proceeds not paid directly to Central were used to pay an obligation of a customer of Franco whose debt was guaranteed by Franco. Although the record is not absolutely clear on the point, apparently that payment also was to Central. The proceeds of the Firestone loan were also deposited in petitioner's account at Union. However, it is likewise clear from the record, although not in writing as in the case of Central, that the agreement was that the funds would be used to pay the guarantor indebtedness which petitioner had to Firestone. The checks from Union likewise were sent to petitioner with the understanding that they would be used to pay petitioner's guarantor indebtedness to Union. In this instance, the deposits were actually made in the lender financial institution. Based on this record as a whole, although *622 petitioner may have had for some short time physical control over the funds represented by the notes used to pay the guarantor liability, the control was never unrestricted. Under petitioner's agreement with the lender, he could not have used these funds for any purpose other than to pay his guarantor liability. This is a restriction on his control of these funds. Certainly the parties were attempting to set up a scenario that would entitle them to a bad debt deduction if such a deduction was otherwise available. They talked to their accountant and lawyer and were advised that they needed to arrange the loans in a way that would give them control of the funds for at least some period of time. Although the record is not clear that the manner in which these transactions were formulated was to comply with the advice petitioner and the other shareholders had received from their accountant and lawyer, the reasonable inference from the record is that this was at least one of the reasons for these arrangements. One of the bank officers did testify that in circumstances comparable to that of petitioner his bank usually did issue a check when the note was signed and have the taxpayer *623 draw a check back to the bank, whether or not this form was requested for the transaction. However, he gave no explanation of why this was done rather than taking the guarantor's note as the payment of the guarantor indebtedness. Based on this record as a whole, we conclude that petitioner, as a cash basis taxpayer, made no payment of the guarantor indebtedness in 1985. The record here is not clear whether some payments on the notes were made in the year 1985. However, petitioner made no contention that payments were made and that the amounts of such payments were deductible in 1985. Since we have concluded that petitioner will not have paid the guarantor indebtedness until actual payments are made on the notes, which the record does not show happened in 1985, it is unnecessary for us to reach the other issues raised by respondent. It is, however, reasonably clear from this record that between 1985 and the time of the trial of this case in 1991 substantial payments had been made by petitioner on his notes. Therefore, the other issues may well have to be resolved in other years. However, the issue of the worthlessness of the resulting debt of the corporations to petitioner, *624 if any arose, might well have to be resolved on different facts in later years from those existing in 1985. In any event, it is unnecessary to reach the other issues to resolve the present case. Decision will be entered for respondent. Footnotes
1. All section references are to the Internal Revenue Code in effect for the years in issue, unless otherwise indicated.↩
2. SEC. 166. BAD DEBTS. (a) GENERAL RULE. -- (1) WHOLLY WORTHLESS DEBTS. -- There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) PARTIALLY WORTHLESS DEBTS. -- When satisfied that a debt is recoverable only in part, the Secretary may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. * * * (d) NONBUSINESS DEBTS. -- (1) GENERAL RULE. -- In the case of a taxpayer other than a corporation -- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) NONBUSINESS DEBT DEFINED. -- For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than -- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩