CLAYTON E. DEVOE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
De Voe v. Commissioner
Docket No. 29360-82.
United States Tax Court
T.C. Memo 1986-477; 1986 Tax Ct. Memo LEXIS 133; 52 T.C.M. (CCH) 641; T.C.M. (RIA) 86477; September 24, 1986. J. Robert Riley, for the petitioner. R. Alan Lockyear, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined deficiencies in petitioner's Federal income tax as follows: Year Ended
Deficiency
December 31, 1978
[1] $39,946.00
December 31, 1979
744.00
December 31, 1980
18,095.00
*138 The primary issues for determination are (1) whether petitioner is entitled to claim certain deductions with respect to his investment in a medical equipment license and (2) whether petitioner is entitled to deductions for depreciation, intangible drilling and completion cost, administration expense and miscellaneous expenses in relation to his interests in two oil and gas leases. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts, the first and second supplemental stipulation of facts, and attached exhibits are incorporated herein by this reference. Petitioner resided in Missoula, Montana, when he filed his petition in this case. Petitioner's main occupations are farming and real estate. Medical Equipment License
In 1978, petitioner's accountant, Bob Bragg, informed him that Bragg knew of a good investment which would be of interest to petitioner. Soon thereafter, Robert Aldridge ("Aldridge"), president of a concern by the name of North Star One, contacted petitioner by telephone with an investment opportunity. North Star One, located in Hayden Lake, Idaho, advertises itself on its letterhead as a promoter *139 of "tax shelters and precious gems." Aldridge explained to petitioner that he had a model of an instrument for the treatment of hemorrhoids by the name of Proctotherm. Proctotherm is a therapeutic instrument, invented by Roger Q. Estes and James S. Latenser in 1976 or 1977, to shrink and to provide temporary relief from the pain of hemorrhoids. A corporation by the name of Bio-tronics, Inc. ("Bio-tronics") owns the right to all title and interest to file for a patent and to fabricate, manufacture or construct the Proctotherm. [2]
*140 On or about December 20, 1978, petitioner entered into a License Agreement with Bio-tronics. Under the License Agreement, Bio-tronics granted to petitioner the exclusive license to promote, distribute, market, and sell the Proctotherm in a specific geographic area. Petitioner's geographic area was Area 65, located in Central North Carolina, and was comprised of 41 marketing units. The fee for the license was $184,500 (41 units times $4,500), payable in cash and two promissory notes. With the execution of the License Agreement, petitioner paid $10,250 in cash ($250 times 41 units). In addition to the cash payment, petitioner executed two promissory notes at the time of the agreement. The first note, with a due date of March 15, 1979, is for the amount of $12,300 ($300 times 41 units) at six percent interest. Petitioner characterizes this note as recourse in nature. The second note, with a due date of December 31, 1985, is a nonrecourse promissory note in the amount of $161,950 ($3,950 times 41 units). The payments on the nonrecourse note are to be made when the product is sold, the amount of the payments determined by multiplying the number of units sold and $4.00. In addition *141 to the License Agreement with Bio-tronics, petitioner signed a Security Agreement and an Advertising Pool Agreement. Under the Security Agreement, Bio-tronics shall look solely to the property and assets covered by this Agreement for the performance of Debtor's [petitioner's] Obligations hereunder and in no event shall Debtor [petitioner] be personally liable for the Obligations hereunder. In the event of any default hereunder, no deficiency or other personal judgment shall be rendered or entered against Debtor [petitioner] with respect to the Obligations contained herein. [Emphasis supplied.] An "Obligation" is defined in the Security Agreement as: any and all loans, indebtedness, liabilities and obligations of any kind owing by the Debtor [petitioner] to Secured Party [Bio-tronics] however evidenced * * * all indebtedness, obligations and liabilities under the License Agreement, Notes and/or any Advances which may be made by Secured Party. [Bio-tronics] [Emphasis supplied.] Under the Advertising Pool Agreement, petitioner agreed to pay the amount of $5,125, to Bio-tronics for a national advertising campaign payable $2,050 ($50 times 41 units) *142 in cash and $3,075 ($75 times 41 units) in the form of a promissory note due May 15, 1979, bearing a six percent rate of interest. Petitioner characterizes this note as recourse in nature. Additionally, petitioner agreed to pay $1.00 per unit to the Advertising Pool for each unit sold within petitioner's marketing area. Finally, on December 20, 1978, petitioner entered into a "Sales and Marketing Agreement" with New Marketing Concepts, Incorporated ["New Marketing Concepts"]. Through the Sales and Marketing Agreement, petitioner appointed New Marketing Concepts as his exclusive marketing agent to promote, market, distribute and sell the product within the marketing area. In consideration for its services, petitioner was to pay New Marketing Concepts a nonrefundable fee of $30,750, payable $2,050 ($50 times 41 units) in cash, $3,075 ($75 times 41 units) through a promissory note due March 15, 1979, at six percent interest and $25,625 ($625 times 41 units) through a nonrecourse promissory note due and payable December 31, 1985, at six percent interest. Petitioner characterizes the $3,075 note as recourse. On December 20, 1978, petitioner signed a check payable to Bio-tronics *143 in the amount of $12,300. [3] Petitioner has never been involved in the business of marketing, promotion, distribution or sale of medically-related products. On December 20, 1978, Aldridge wrote petitioner that Aldridge would arrange for the sale and transfer of ownership of the Proctotherm license for Area 65 no later than March 15, 1979, for total consideration of "second year" cash payments. While it is not clear when the U.S. patent was obtained on the Proctotherm, the device did not become marketable until 1981. While the company applied to the Federal Drug Administration ("FDA") in 1977 or 1978 for approval to market the device, Bio-tronics did not receive conditional approval to market the device until 1981. [4] The conditions on the sale of Proctotherm were removed in 1982. While a few thousand Proctotherm devices have been sold to date, no devices have been sold in Area *144 65. Bio-tronics has never sustained a profitable year. On his 1978 return, petitioner deducted the following in respect to his Proctotherm license on Schedule C: Amortization of license fee
$23,062
Marketing contract
30,750
Advertising
2,050
Interest
2,030
$57,892
As no income was realized from the Proctotherm distributorship, petitioner recorded a $57,892 net loss from the medical equipment distributorship. Petitioner recognized no income and claimed no further deductions for the Proctotherm distributorship on subsequent returns. In his statutory notice of deficiency, respondent allowed only $46,498 of the $57,892 deductions claimed by petitioner on his 1978 return as ordinary and necessary business expenses. Respondent further asserts that in 1979 petitioner was entitled to an interest expense deduction of $11,510 which was not claimed on the return. In 1980, respondent asserts that petitioner has realized income of $45,707.31 from the discharge of accrued liabilities. However, *145 in his amendment to answer [5] filed November 5, 1984, respondent alleges that, since petitioner was not in the trade or business of marketing the Proctotherm device during the years in issue and petitioner did not engage in the activity to make a profit, petitioner is entitled to no deductions in 1978 and no interest deduction in 1979. [6]
Oil and Gas Interest
Petitioner obtained an undivided one percent of a 73 percent net lease interest in two oil and gas leases. Petitioner's interests are known as Weimen No. 29-1 and Ludwig No. 21-1 (the "properties"). J & D Enterprises assigned these one percent interests in the properties to petitioner. J & D Enterprises purchased these interests from L.G. Williams Oil Company (L. G. Williams"). [7] Under a "Letter Agreement" dated June 25, 1979, between petitioner and L. G. Williams, petitioner agreed to pay all invoices from L. G. Williams if L. G. Williams drills a well on each of the properties. If petitioner does not pay the invoices within ten days, petitioner may forfeit his interests *146 in the wells. On October 1, 1979, petitioner wrote a check payable to J & D Enterprises in the amount of $10,760. On February 2, 1982, and June 23, 1982, petitioner received past due notices from L. G. Williams for the amounts of $14,223.61 and $14,396.59, respectively. Petitioner made a timely election under section 263(c)[8] and section 1.612-4, Income Tax Regs., to deduct intangible drilling and development costs currently for Federal income tax purposes. Petitioner made the election on his 1979 return. In his statutory notice of deficiency dated September 28, 1982, respondent disallowed the $10,168 which petitioner deducted on his 1979 return for depreciation, [9] intangible drilling costs, intangible completion costs, administrative expenses and miscellaneous *147 expenses in connection with his interest in Weimen No. 29-1 and Ludwig No. 20-1. In connection with petitioner's 1980 return, respondent disallowed petitioner's deduction for depreciation of $300. [10]
OPINION Before determining to what deductions, if any, petitioner is entitled in relation to his Proctotherm license and his Oil and Gas Interests, we must initially determine whether petitioner is a cash basis taxpayer with respect to both activities. Respondent assumes in his arguments that petitioner is a cash basis taxpayer. On the other hand, petitioner states that petitioner's tax returns filed for the taxable years 1978, 1979 and *148 1980 were prepared and filed on the accrual method of accounting. Section 446(a) requires taxable income to be computed "under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." If the taxpayer has not regularly used a method of accounting, "the computation of taxable income shall be made under such method, as in the opinion of the Secretary, does clearly reflect income." Sec. 446(b). If the taxpayer has regularly used a certain method of accounting, the taxpayer must secure the consent of the Secretary before changing the method of accounting. Sec. 446(e). However, a taxpayer engaged in more than one trade or business may, in computing taxable income, use a different method of accounting for each trade and business. Sec. 446(d). Section 1.446-1(d)(1), Income Tax Regs., states: Where a taxpayer has two or more separate and distinct trades or businesses, a different method of accounting may be used for each trade or business, provided the method used for each clearly reflects income of the particular trade or business * * *. The method first used in accounting for business income and deductions in connection with *149 each trade or business, as evidenced in the taxpayer's income tax return in which such income or deductions are first reported, must be consistently followed thereafter. [Emphasis supplied.] With respect to the Proctotherm license, petitioner first reported deductions for the taxable year 1978 on his 1040 income tax return. [11] On Line E of his Schedule C, petitioner indicated that he reported income and deductions based upon the cash method of accounting by placing an "X" in the box next to "Cash." In 1979, petitioner first reported deductions with respect to his oil and gas activity. Again, petitioner indicated that he reported income and deductions based on the cash method of accounting by placing an "X" in the box next to "Cash" on line E of Schedule C. In 1980, petitioner deducted $300.00 in depreciation with respect to his drilling interest and once again, he indicated that he used the cash method of accounting on Line E of Schedule C. Petitioner submits *150 that he is entitled to a deduction on an accrual basis because, in his farming business, he deducted expenses paid by the means of a promissory note. Even if petitioner used the accrual method with respect to his farming business, a question we decline to consider, petitioner's accounting method with respect to farm income is in relation to a separate trade or business and thus has no bearing on our decision in light of section 446(e) and 1.446-1(a)(1), Income Tax Regs. On the basis of the record before us, we conclude that petitioner was required to report under the cash method of accounting with respect to his Proctotherm license and his Oil and Gas Interest. However, this conclusion does not reflect or infer that we find either the Proctotherm license or oil and gas interest to be a "trade or business" under section 162. Medical Equipment License
Respondent makes several arguments to support his denial of petitioner's deductions associated with the Proctotherm License. First, respondent asserts that petitioner is not entitled to deduct any expenses with respect to the Proctotherm license because he did not engage in the activity to make a profit. Second, respondent states *151 that since petitioner did not engage in the activity to make a profit and was not engaged in the trade or business of marketing the Proctotherm device, petitioner is not entitled to the deduction of $23,062 for the cost of the license pursuant to section 1253(d). Third, respondent asserts that petitioner realized income in 1980 in the amount of $45,707.31 from the discharge of accrued liabilities. Finally, respondent states that petitioner, as a cash basis taxpayer, may only deduct interest expense which is actually paid. Except for the argument relating to the cancellation of indebtedness income, respondent bears the burden of proof on all arguments due to the fact that respondent raised these arguments in his amendment to his answer. Rule 142(a). Based upon our determination herein, we need not address respondent's remaining alternative arguments. Since respondent's profit-motive arguments, if accepted, would be largely dispositive of the license deductions before us, we will first address those issues. Section 183(a) provides that if an individual's activity constitutes an activity "not engaged in for profit," the deductions arising out of such activity shall not be allowed *152 except as provided in 183(b). An "activity not engaged in for profit" is defined in section 183(c) as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." If the activity is not engaged in for profit, section 183(b) separates the claimed deductions into two groups. Section 183(b)(1) allows only those deductions which are not dependent on profit motive. Section 183(b)(2) provides that deductions which would be allowed only if the activity is engaged in for profit shall be allowed, but only to the extent that the gross income from the activity exceeds the deductions otherwise allowable under section 183(b)(1). Section 162(a) allows as a deduction all the necessary and ordinary expenses paid or incurred during the taxable year in carrying on any trade or business. In order to constitute the carrying on of a trade or business under section 162, an activity must be entered into with an actual and honest objective to make a profit therefrom. Herrick v. Commissioner,85 T.C. 237, 254 (1985); Dreicer v. Commissioner,78 T.C. 642 (1982), affd. *153 without opinion 702 F.2d 1205 (D.C. Cir. 1983); Hirsch v. Commissioner,315 F.2d 731 (9th Cir. 1963), affg. a Memorandum Opinion of this Court. [12] Profit in this context means economic profit, independent of tax savings. Surloff v. Commissioner,81 T.C. 210 (1983). The issue of whether a taxpayer engages in an activity with the requisite profit objective is one of fact to be resolved on the basis of all the surrounding facts and circumstances.Sec. 1.183-2(b), Income Tax Regs.; Engdahl v. Commissioner,72 T.C. 659 (1979); Allen v. Commissioner,72 T.C. 28 (1979). In determining whether an activity is engaged in for profit, the following factors are to be considered: (1) the expertise of the taxpayer in carrying on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets *154 used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Sec. 1.183-2(b), Income Tax Regs., Boyer v. Commissioner,69 T.C. 521 (1977); Benz v. Commissioner,63 T.C. 375 (1974). It is not intended, however, that only the aforesaid factors be taken into account in making the determination. Sec. 1.183-2(b), Income Tax Regs. No single factor is determinative and the issue is to be resolved by examining all the circumstances. Fuchs v. Commissioner,83 T.C. 79, 98 (1984); Dean v. Commissioner,83 T.C. 56, 74 (1984); Flowers v. Commissioner,80 T.C. 914, 931 (1983); Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). In our determination, we ascribe greater weight to objective factors than to mere after-the-fact statements *155 of intent. Fuchs v. Commissioner,supra;Siegel v. Commissioner,78 T.C. 659, 699 (1982); Engdahl v. Commissioner,supra.
Turning to the record before us, an examination of the factors listed in Section 1.183-2(b) is illuminating. First, petitioner admits that he carried on no profit-directed activity. Moreover, the mere execution of the necessary paperwork to acquire a territorial license does not constitute a trade or business. Herrick v. Commissioner,supra.Second, petitioner concedes that although he does have some experience in retail sales, he has no expertise in the business of marketing, promotion, distribution and sale of any medically-related products.Petitioner testified that he believed the Proctotherm device was "feasible" based solely on his knowledge as a sufferer of hemorrhoids. Third, petitioner admits that he spent no time or effort in carrying on the activity. Fourth, petitioner had no expectation that the assets used the in activity would appreciate in value. [13] Fifth, although involved in retail sales of real estate, petitioner has no experience in the distribution of medical *156 devices. Sixth, petitioner claimed no income in respect to his Proctotherm distributorship for the taxable year 1979 and claimed deductions amounting to $57,892.00 in that taxable year. Petitioner did not attach a Schedule C for his distributorship to either his tax returns for the taxable years 1979 and 1980. Seventh, no profits were ever earned by the distributorship. Eighth, petitioner's financial status was such that he considered himself a suitable applicant for a Proctotherm license. The Bio-tronics application for the Proctotherm license stated that: this type of business is generally not suitable for persons who do not possess substantial annual income (i.e. in excess of $100,000,00) or substantial annual income (i.e. adjusted gross income subject to Federal income tax at a rate of 40% or higher), do you believe that you are a suitable applicant? On his application, petitioner answered "yes" to this question.We believe a reasonable inference from this response in context with other statements in the *157 record [14] is that in entering this deal, petitioner's primary focus centered on the tax-savings aspects of the Proctotherm license rather than the deal's profit potential. Finally, there is obviously no element of personal pleasure or recreation involved in this case. [15]
Petitioner argues that his primary motivation in entering into the Proctotherm license was to make a profit. Petitioner's credibility is not altogether convincing. Petitioner's testimony was often confused, ambivalent, and equivocal. Thus, we need not accept petitioner's self-serving, uncorroborated testimony. Moreover, petitioner admits that another purpose of making *158 the investment in Bio-tronics was to obtain deductions in the taxable year 1978. We believe that petitioner did not learn that the Proctotherm patent did not exist at the time of the license agreement and that FDA approval had not been obtained until after he bought the license. However, such evidence serves to highlight that in making his decision to invest in the Proctotherm license, petitioner did not independently investigate the existence of the patent and FDA approval, or the qualifications of the inventors of the Proctotherm device or the management of Bio-tronics or New Marketing Concepts. Petitioner did not check on the patent and FDA status of the Proctotherm device after speaking to Aldridge in December, 1978. Rather, in a letter dated March 9, 1979, Bio-tronics, apparently on its own initiative, informed petitioner that the patent had not yet been obtained. Failure to make such elementary inquiries and to obtain expert advice in a transaction of this magnitude is not consistent with ordinary sound business practice, and may be regarded as evidence that petitioner lacked a profit motive. See Herrick v. Commissioner,supra;Flowers v. Commissioner,supra; *159 Surloff v. Commissioner,supra; compare Waddell v. Commissioner,86 T.C. 848 (1986). Finally, on the day he signed the License Agreement and paid the cash requirements, Aldridge agreed on petitioner's request to sell petitioner's interest in early 1979. In his petition, petitioner states that this agreement's effect was that he would have his costs "expended in 1978 and recapture and declare in 1979 the sale price of the amount of the notes." This arrangement smacks of nothing but motivation for tax avoidance. From a close examination of the entire record, we find that respondent has met his burden of proof and find that petitioner's Proctotherm distributorship was not an activity engaged in for profit. Consequently, we hold that petitioner is not entitled to business deductions under section 162 due to the absence of profit motive and objective. Having determined the profit objective issue, we now consider the payments made by petitioner for his Proctotherm license. Respondent asserts that petitioner is not entitled to an amortization deduction pursuant to section 1253(d) where petitioner has not entered the trade or business. We agree. *160 Section 1253(d) governs the treatment of payments made by a transferee of a franchise. [16] If the payments are "contingent on the productivity, use, or disposition of the franchise," section 1253(d)(1) provides that such payments are deductible within the meaning of section 162. If the payments made by transferee are not contingent, section 1253(d)(2) governs the tax treatment of such payments.Section 1253(d)(2) provides the period over which a transferee may deduct fixed payments depending on whether the license obligation is paid off with a single payment, approximately equal payments, or by any other arrangement for payment.Section 1253(d)(2)(B) provides for the deduction through amortization of acquisition payments over the period of the transfer agreement or a period no longer than ten years. Sec. 1253(d)(2)(B). On his 1978 return, petitioner amortized his license over eight years, deducting $23,062 ($184,500 divided by eight) on his Schedule C. [17] Petitioner's initial $10,250 cash payment, the $12,300 promissory note, and the $161,950 nonrecourse note are payments involved in the section 1253(d)(2) amortization deduction. [18]
*161 Section 1253(d)(1) specifically provides that amounts paid or incurred as therein described "shall be allowed as a deduction under section 162(a) (relating to trade or business expense)." Section 1253(d)(2) does not contain a reference to section 162, or to any other section of the Code. However, in Herrick v. Commissioner,supra, this Court held that, in light of the legislative history of section 1253, [19] section 1253(d)(2) embodies a trade or business requirement despite the absence of a specific reference thereto. [20]Herrick v. Commissioner,supra at 266. Thus, in order for petitioner to deduct his license fee payments under section 1253(d)(2), petitioner must be operating or conducting a trade or business after the payments are made. Earlier in this opinion, we found that petitioner was not entitled to business deductions under section 162 with respect to his Proctotherm distributorship because petitioner did not possess the the requisite *162 profit objective. The mere signing of an agreement for the transfer of a franchise or distributorship and payment of the acquisition or initial fees, do not, ipso facto, entitle the taxpayer to a deduction. Herrick v. Commissioner,supra at 266. On the basis of our previous finding, we hold that petitioner is not entitled to amortize any part of the Proctotherm license acquisition fee under section 1253(d). We now turn to respondent's assertion that petitioner realized $45,707.31 in cancellation of indebtedness income due to the discharge of accrued liabilities. [21] On this issue we hold for the petitioner. First, at trial and on brief, we note that respondent concedes the cancellation of indebtedness issue if we find that petitioner is not entitled to any deductions with respect to the Proctotherm activity during 1978 or 1979. We have denied all of petitioner's deductions with respect to the *163 Proctotherm activity under 162 and 1253, and we agree with respondent that no cancellation of indebtedness issue exists for the following reasons. With respect to the five notes executed by petitioner in connection with the Proctotherm activity, we find that petitioner does not have indebtedness within the meaning of section 61(a)(12) because we determine that the five notes do not constitute genuine liabilities of petitioner. We have determined that petitioner was not engaged in a trade or business under sections 162 and 1253 because he lacked the requisite profit objective. We have further scrutinized the overall Procotherm licensing activity to ascertain whether its form comports with economic reality. See Commissioner v. Court Holding Co.,324 U.S. 331 (1945); Gregory v. Helvering,293 U.S. 465 (1935). Upon careful inquiry, we determine that the entire Proctotherm license was not authentic in substance and that the loan transactions had no genuine "purpose, substance, or utility apart from their anticipated tax consequences." Goldstein v. Commissioner,364 F.2d 734, 740 (2d Cir. 1966), affg. 44 T.C. 284 (1965), *164 cert. denied 385 U.S. 1005 (1967). [22]
We are satisfied that the two nonrecourse notes which petitioner executed have no economic substance. [23] Although the notes carried a due date of December 31, 1985, the notes looked primarily to the sale of the Proctotherm device for payment. However, there was no patent or FDA approval for the Proctotherm at the time of the execution of the notes nor for almost three years after that date. The notes were not carried as an asset on the balance sheet of Bio-tronics but are only noted in an auditor's statement. Moreover, we determine that the remaining three notes which petitioner executed are nonrecourse as well. [24] As stated in the Security Agreement, petitioner "in no event" is personally liable for the "obligations and liabilities under the License Agreement." We read "obligations and liabilities under the License *165 Agreement" to include the promissory notes executed pursuant to the Sales and Marketing Agreement. Furthermore, although the three notes were over five years delinquent at trial, no legal action had been or was being taken to enforce the notes. Additionally, the notes were not carried as an asset on the books of the corporation. Accordingly, we conclude that the notes are without substance and do not constitute a true liability of petitioner. Since we have found that these notes impose no liability obligation on petitioner, we determine, a fortiori, that there is no cancellation of indebtedness income therefrom to petitioner under section 61(a)(12). Thus, we hold for petitioner and deny respondent's assertion that petitioner realized income in 1980 in the amount of $45,707.31. *166 Finally, we must determine if petitioner is to be allowed any deductions under section 183(b). Section 183(b)(1) allows deductions otherwise allowable without regard to whether or not an activity is engaged in for profit. Section 163 provides that a deduction shall be allowed for all interest paid or accrued on indebtedness within the taxable year. Petitioner executed two nonrecourse promissory notes and three interest bearing promissory notes regarding his distributorship. We have held that these notes do not constitute true indebtedness. [25] Petitioner testified that he made no cash payments of either interest or principal on any promissory notes. However, petitioner accrued interest expense on his 1978 return of $2,030. We hold that petitioner is not entitled to deduct interest expenses in 1978 for two reasons. First, in order for interest to be deductible under section 163(a), it must be paid on genuine indebtedness. Knetsch v. United States,364 U.S. 361 (1960); Narver v. Commissioner,75 T.C. 53, 98 (1980), affd. 670 F.2d 855 (9th Cir. 1982). Where transactions *167 lack substance and are entered into solely to form the basis of a tax deduction, they need not be recognized. Battelstein v. Internal Revenue Service,611 F.2d 1033, 1035 (5th Cir. 1980); Goodstein v. Commissioner,30 T.C. 1178 (1958), affd. 267 F.2d 127 (1st Cir. 1959). We have found that petitioner's notes with respect to the Proctotherm activity lacked economic substance and were entered into solely to form the basis of tax deductions. Accordingly, we hold that petitioner may not deduct interest on such notes under section 163(a). [26]
Second, petitioner, as a cash basis taxpayer, may only deduct amounts that petitioner paid during the taxable year. It is hornbook tax law that a cash basis taxpayer may deduct expenses only in the year paid. Sec. 1.461-1(a)(1), Income Tax Regs.; Helvering v. Price,309 U.S. 409 (1940). The accrual of interest expense is clearly inconsistent with the cash method of accounting. Deductions allowed for interest expense under section 163(a) must be limited to actual amounts paid. Petitioner paid no interest *168 expense in 1978, 1979, or 1980 and, correlatively, no interest expense is deductible. Section 183(b)(2) allows deductions "to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable" by section 183(b)(1). We need not address application of this section to the circumstances extant as there is no gross income derived from the activity in the taxable year in question and we have allowed no deductions under section 183(b)(1). In sum, all deductions taken by petitioner in respect to his Proctotherm activity are denied for the taxable year 1978. We also deny the deduction for interest expense for the taxable year 1979 raised by respondent in his statutory notice of deficiency and later denied by respondent in his amendment to answer. However, we hold that petitioner does not have cancellation of indebtedness income from the discharge of accrued liabilities for the taxable year 1980. Oil and Gas Interest
In his statutory notice of deficiency, respondent denied petitioner's deductions for depreciation, intangible drilling costs (sometimes hereinafter referred to as "IDC"), administration expenses, and miscellaneous expenses *169 of $10,168 because petitioner did not establish that the alleged expenditures relating to two oil and gas wells were incurred by L.G. Williams Oil Company, or were paid for by petitioner. Respondent has also denied petitioner's deduction for depreciation of $300 in 1980 on the same grounds. Petitioner alleges that, in addition to the $10,168 payment, he is entitled to a $14,500 drilling deduction in either 1979 or 1980 for which L. G. Williams billed him and which he has not paid. [27]
Section 263(c) authorizes a taxpayer to elect to deduct intangible drilling and development costs as expenses in accordance with regulations prescribed by respondent. Section 1.612-4, Income Tax Regs., which implements section 263(c), provides an option to capitalize or to deduct currently intangible drilling expenses incurred in the development of gas or oil properties. The election is available only to an "operator", who is defined as one who holds a working or operating interest in any tract or parcel of land either *170 as a full owner or under a lease or any other form of contract granting working or operating interests. It is not sufficient if a taxpayer merely supplies the money to pay for drilling in exchange for an oil payment. In such cases, the taxpayer would have to capitalize his expenditures as acquisition costs of a nonoperating interest. Burns v. Commissioner,78 T.C. 185 (1982). Section 1.612-4(c), Income Tax Regs., provides in part that: The option granted * * * to charge intangible drilling and development costs to expense may be exercised by claiming intangible drilling and development costs as a deduction on the taxpayer's return for the first taxable year in which taxpayer pays or incurs such costs * * *. If a taxpayer elects to expense intangible drilling costs then the appropriate year of deduction is determined pursuant to section 461 and the regulations thereunder. Stradlings Building Materials, Inc. v. Commissioner,76 T.C. 84, 86 (1981). More particularly, this Court in Stradlings has set forth four criteria which taxpayer must satisfy in order to qualify for the option under section 1.612-4(a), Income Tax Regs.Stradlings,supra at 89. *171 First, the taxpayer must hold an operating or working interest in the property under development. Second, the costs in question must relate to the development of the property in which the taxpayer has a working or operating interest. Third, the nature of the expenditure must fall within the definitional guidelines provided by section 1.612-4(a), Income Tax Regs. Finally, the payment or incurrence of the costs must occur sufficiently early in the development stages so that the taxpayer is exposed to the unknown risks of development. Thus, to determine if petitioner is eligible to deduct any IDC expense in 1979 and 1980, we must make two inquiries. First, we must determine if petitioner made a timely election to deduct his expense in a year appropriate to his method of accounting. Second, we must determine if petitioner met the four criteria to qualify for the option to expense IDC costs under section 1.612-4(a), Income Tax Regs.
Respondent's determination of the deficiency is presumptively correct. Welch v. Helvering,290 U.S. 111, 115 (1933). In order to overcome this presumption, petitioner must offer evidence that shows the determination is erroneous. Guersten v. Commissioner,267 F.2d 195, 199 (9th Cir. 1959), *172 affg. in part 28 T.C. 756 (1957). Petitioner bears the burden of proving entitlement to the claimed deduction. Rule 142(a). The law is well settled that tax deductions are a matter of legislative grace. New Colonial Ice Co. v. Helvering,292 U.S. 435, 440 (1934). Petitioner, when referring to section 263(c) to justify his deductions, must establish that he falls within its terms. Roberts v. Commissioner,62 T.C. 834, 836 (1974). Here, we find that petitioner has not met his burden of proof for the following reasons. First, petitioner has properly elected to expense IDC costs in 1979. However, since we have found that petitioner is a cash basis taxpayer for purposes of the drilling activity, he can only deduct expenses for which he has actually paid or suffered an economic detriment. Sec. 1.461-1, Income Tax Regs.; Levy v. Commissioner,732 F.2d 1435 (9th Cir. 1984), affg. a Memorandum Opinion of this Court. Since petitioner has paid the sum of $10,760 to J. & D. Enterprises and deducted $10,168 on his 1979 return, we must determine if petitioner satisfied the four criteria of section 1.162-4, Income Tax Regs. *173 , as to the $10,168 deduction amount. We need not consider the $14,223 deduction which petitioner raised in his petition before the Court, because, as a cash method taxpayer, petitioner is not entitled to a deduction as he has not paid nor suffered an economic detriment as to this amount. We hold that petitioner does not meet all four criteria necessary to qualify for the option to expense IDC costs under section 1.612-4(a), Income Tax Regs., with respect to the $10,168 deduction on his 1979 return. Initially, on the facts before us, it is not clear if petitioner owns an operating or working interest in the properties.The parties have stipulated that petitioner obtained an interest in two oil and gas leases from L. G. Williams on or about June 25, 1979. Petitioner entered into a Letter Agreement with L. G. Williams on June 25, 1979, by which L. G. Williams agreed to drill a well on each of the properties. Petitioner agreed to pay all invoices submitted to him by L. G. Williams. Petitioner paid J & D Enterprises $10,760 on October 1, 1979. However, there is no evidence of what this payment is for or why petitioner paid this amount to J & D Enterprises instead of the driller *174 L. G. Williams. Petitioner's testimony on this matter is confused and equivocal. Moreover, the assignment of these interests in these properties to petitioner from J & D Enterprises was signed on August 7, 1980. As a result, we cannot determine when petitioner acquired his interest in the properties, if petitioner acquired an interest, or what kind of interest he acquired. More importantly, petitioner does not satisfy the three other Stradlings criteria. First, petitioner does not relate the $10,168 of claimed expenses to the properties in which he has an interest. Second, petitioner has not shown that his expenditure satisfies the definitional guidelines of section 1.612-4(a), Income Tax Regs.[28] Finally, given the lack of evidence presented by petitioner at trial, we cannot determine if the payment or incurrence of the drilling costs occurred sufficiently early in the developmental stages of the well so that the taxpayer is exposed to the unknown risks of development. *175 Turning to the facts before us, petitioner has not shown how he arrived at the figures deducted on his return. On his 1979 return, on Schedule No. 6, petitioner gives tangible costs not only for the Ludwig and Weimen wells but for "Girard", presumably another well. On his 1979 return, petitioner states that he acquired Girard in 1979 but neither party makes mention of this interest.The Court also received into evidence a billing to J & D Enterprises from L. G. Williams listing numerous tangible and intangible drilling and completion costs in addition to miscellaneous and administrative expenses. Petitioner has not explained these figures or correlated these expenses to those claimed on the return. We cannot find any true correlation and, as a result, do not know what the $10,760 payment to J & D Enterprises represented nor can we substantiate the items that constitute the $10,168 worth of deductions. While we cannot determine if petitioner acquired a working interest in the properties, we note that oil and gas interests in which the working interest and drilling contract are available in one package deal are subject to close scrutiny. Bernuth v. Commissioner,470 F.2d 710 (2d Cir. 1972), *176 affg. 57 T.C. 225 (1971). In such a situation, the availability of the intangible drilling cost option provides a strong incentive to overstate the drilling costs and minimize the cost of the working interest. Bernuth v. Commissioner,470 F.2d at 715. Thus, the difference between the deductible drilling costs and the total amount paid may well be attributable to capital cost of the total package purchased, including not only the reasonable value of the lease acquired but also disguised premiums to promoters and promotional charges. Bernuth v. Commissioner,supra.While the Assignment of Interest in the wells from J & D Enterprises to petitioner stated that petitioner paid "ten dollars, and other valuable consideration" for the interests, the mere entry into evidence of these terms does not overcome the presumption of correctness given to the Commissioner's deficiency determination. Bernuth v. Commissioner,470 F.2d at 716.No specific allocation of the purchase price was made in any documents before the Court. Petitioner presented no evidence as to the value of the leases or his interest. It appears that J & D *177 Enterprises was experienced and skilled in locating oil and gas property and petitioners benefitted therefrom in investing through J & D Enterprises. This alone creates an inference that the leases had some value. [29]
Petitioner cites Keller v. Commissioner,79 T.C. 7 (1982), affd. 725 F.2d 1173 (8th Cir.1984), in support of his position that he is entitled to the claimed drilling deductions. Keller is distinguishable from petitioner's case.In Keller, the Court stated a three-part test to determine the current deductibility of prepaid IDC for cash basis taxpayers. However, in Keller, respondent accepted that IDC's had been incurred. The key issue was in which year the deduction for IDC should be allowed. Keller v. Commissionersupra at 27. Here, we cannot reach the Keller analysis because we have no knowledge that the payments were for IDC's. See Keller v. Commissioner, 725 F.2d at 1175. *178 Petitioner brought forward no witnesses from J & D Enterprises or L. G. Williams to verify his deductions and presented no evidence to clarify and substantiate how he arrived at the figures which he deducted. Nothing in the record provides a tenable explanation for the allocations made on the tax return of petitioner. We need not accept petitioner's self-serving, uncorroborated testimony. Petitioner's evidence is inconsistent and incomplete. We find the same shortcoming with respect to petitioner's 1980 deduction for depreciation. We have considered all of petitioner's arguments and find them unpersuasive. On the basis of the record, we hold that petitioner has failed to carry the burden that respondent's denial of all drilling deductions is erroneous. Accordingly, we sustain respondent's denial of petitioner's deductions for depreciation, intangible drilling costs, intangible completion costs, and miscellaneous expenses in 1979 and 1980. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. In the statutory notice of deficiency dated September 28, 1982, respondent determined a deficiency for petitioner's taxable year 1978 of $11,511. However, in the amendment to answer filed at trial on November 5, 1984, respondent increased the deficiency for 1978. As a result, respondent bears the burden of proof as to the increases. Rule 142(a), Tax Court Rules of Practice and Procedure. By denying the total $57,892 of alleged expenses on Schedule C of petitioner's 1978 return, petitioner's income is increased by $46,498.00 above the determination in the statutory notice of deficiency. Thus, petitioner's deficiency for 1978 is increased from $11,511 to $39,946. In the amendment to answer, respondent also denied interest expense in 1979 which increased petitioner's income by $11,510 above the determination made in the statutory notice. In the statutory notice, respondent had allowed petitioner an interest expense deduction of $11,510 which petitioner had not claimed on the return. However, respondent did not increase petitioner's 1979 deficiency because, despite the adjustment, petitioner still had negative taxable income for 1979 which results in a minimum tax of $744 on accelerated depreciation on leased personal property associated with neither the medical equipment license nor the oil and gas interest. In his statutory notice of deficiency, respondent allowed a tentative investment tax credit of $570 for petitioner instead of a $278 amount shown on petitioner's 1980 return. Neither petitioner nor respondent addressed this allowance or the minimum tax deficiency for taxable year 1979 on brief. Since respondent's determination is presumptively correct, petitioner failed to satisfy the burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure.↩ As a result, we sustain respondent's allowance and deficiency on these two issues.
2. The original patent and manufacturing rights to "Proctotherm" were sold to a partnership called Proctotherm Limited Partnership on April 1, 1977. On May 8, 1978, Proctotherm Limited Partnership transferred its Proctotherm assets to a new corporation called Thermo-tronics Incorporated. On November 21, 1978, Thermo-tronics Incorporated changed its corporate name to Bio-tronics Incorporated. Although Bio-tronics has since changed its name to Theratech, Inc., and the name of the device has been changed from "Proctotherm" to "Thermotherapy", we will refer throughout the opinion to the corporation as "Bio-tronics" and the device as the "Proctotherm."↩
3. The $12,300 check constitutes the cash payments of $10,250 and $2,050 under the License Agreement and Advertising Pool Agreement, respectively. From the record, we determine that petitioner never made the cash payment of $2,050 to New Marketing Concepts under the Sales and Marketing Agreement.↩
4. Conditional approval meant that the FDA required that a patient's use of the Proctotherm required a physician's prescription and informed consent by the patient.↩
5. Rule 41(a), Tax Court Rules of Practice and Procedure.↩
6. This is a deduction that respondent raised in the statutory notice of deficiency.↩
7. These agreements appear to be signed on August 7, 1980, contrary to the testimony of petitioner that he purchased his interest in 1979. Nevertheless, petitioner paid J & D Enterprises $10,760 on October 1, 1979.↩
8. All section references are to the Internal Revenue Code of 1954, as amended and as in effect during the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
9. Petitioner reported his depreciation on his drilling interests in 1979 as follows: ↩
Property
Date Acquired
1979 Depreciation
Girard
11-79
$26 Ludwig
11-79
45
Weimen
11-79
32
10. We cannot tell how petitioner reported his depreciation on his drilling interest in 1980. Schedule C, on which petitioner deducts $300.00 in depreciation, refers to Schedule 6 for allocation. No schedule 6 exists on the record for taxable year 1980. In 1980, petitioner reported income of $863.86 from his oil and gas interests.↩
11. Petitioner filed two amended 1040 returns for the taxable year 1978. However, the changes made in the returns do not involve deductions with respect to his Proctotherm license or his Oil and Gas interest.↩
12. See also Brannen v. Commissioner,722 F.2d 695 (11th Cir. 1984), affg. 78 T.C. 471 (1982); Hager v. Commissioner,76 T.C. 759↩ (1981), and cases cited therein.
13. In an effort to evade liability and thus limit his interest in the activity, petitioner had Aldridge mark the $25,625 New Marketing Concepts note as "nonrecourse."↩
14. The record does not contain the tax opinion which accompanied the Bio-tronics application; however, in a letter from Aldridge to petitioner on December 3, 1975, Aldridge urged petitioner not to sell his license of Area No. 65 because "the tax deductions for that area will be higher" in 1979 than "originally anticipated." In fact, instead of a 1.62 to one ratio of tax benefits, Aldridge projects a 2.46 to one write-off for petitioner in 1979. ↩
15. In this respect we empathize with petitioner's status as a "sufferer of hemorrhoids."↩
16. The term "franchise" includes an agreement which gives one of the parties to the agreement the right to distribute, sell, or provide goods, services, or facilities, within a specific area. Sec. 1253(b)(1). ↩
17. On his return, petitioner erroneously stated that he amortized his license fee over seven years under the straight-line method. ↩
18. See our discussion infra, beginning on p. 22 where we hold that the $12,300 promissory note and the $161,950 nonrecourse note are not genuine indebtedness.↩
19. See H. Rept. 91-413 (1969), 1969-3 C.B. 200, 302; S. Rept. 91-552 (1969), 1969-3 C.B. 423↩, 557. 20. Powell v. Commissioner,T.C. Memo. 1986-369↩.
21. Respondent calculated the $45,707.31 amount as follows: ↩
Accrued Advertising Expense, Bio-tronics Note
$3,075.00
Accrued Marketing Expense, New Marketing Note
28,700.00
Accrued Interest
11,882.31
Other Accrued Marketing Expense
2,050.00
22. See also Knetsch v. United States,364 U.S. 361 (1960); Falsetti v. Commissioner,85 T.C. 332↩ (1985).
23. These notes are the $25,625 note payable to New Marketing Concepts due December 31, 1985 and the $161,950 note payable to Bio-tronics, Inc. due December 31, 1985.↩
24. These notes constitute the promissory note pursuant to the Advertising Pool Agreement in the amount of $3,075 due May 15, 1979, the promissory note pursuant to the License Agreement in the amount of $12,300 due March 15, 1979 and the promissory note pursuant to the Sales and Marketing Agreement in the amount of $3,075 due March 15, 1979. Petitioner characterizes these notes as recourse liabilities.↩
25. See our discussion, supra,↩ beginning on page 22.
26. See Surloff v. Commissioner,81 T.C. 210, 242↩ (1983).
27. The $14,500 amount is not claimed on petitioner's return but is raised in his petition. Petitioner later changes the amount of the deduction to $14,223 in his reply brief.↩
28. In general, Drilling and Development Costs must be allocated between tangible and intangible costs in order to determine what is properly expensed. See Levy v. Commissioner,732 F.2d 1435, 1438 (9th Cir. 1984).Levy is distinguishable from our case in that in Levy the parties stipulated to the amount of tangible and intangible cost incurred. In Levy, the taxpayer conceded that his costs must be allocated between tangible and intangible costs in order to determine what may be expensed. The issue in Levy revolved around whether the amount of Levy's cash contribution in his partnership interest must be allocated between tangible and intangible costs. The Ninth Circuit agreed with this Court's determination that since the sum of IDC's expended exceeded Levy's cash investment, Levy may expense IDC's to the extent of his cash investment. Levy v. Commissioner,supra at 1438. Here, petitioner has not proven that he incurred IDC expense and, as a result, we cannot reach the Levy↩ analysis.
29. See Roby v. Commissioner,T.C. Memo. 1983-688. We distinguish Hedges v. Commissioner,41 T.C. 695 (1964). In Hedges,↩ we found all costs incurred were IDC. Here, we are unable to determine this on the basis of the evidence.