**Gloria FELCYN, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. CV 82–2674 RG (Bx).**

United States District Court, C.D. California.

June 2, 1988.

Robert C. Bonner, U.S. Atty., Charles H. Magnuson, Asst. U.S. Atty., Chief, Tax Div., Edward M. Robbins, Jr., Asst. U.S. Atty., Los Angeles, Cal., for U.S.

Christine M. Frahm, Christine M. Frahm, A Professional Corp., Goebel, Shensa & Beale, San Diego, Cal., for plaintiff Gloria Felcyn.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GADBOIS, District Judge.

For purposes of and in support of the Order of Judgment, the court makes the following Findings of Fact and Conclusions of law:

### FINDINGS OF FACT

#### A. *The Tax Deduction*

1. On her tax return for 1977, plaintiff Gloria Felcyn ("Felcyn") claimed an investment interest expense deduction of $5,504.00. This deduction was identified as her share of the investment interest expense claimed on the 1977 tax return of Duncan Properties Partnership ("Duncan")

and as a carryover of investment interest expenses claimed by Duncan for 1976. The Internal Revenue Service disallowed this deduction and based on such disallowance assessed a tax deficiency against Felcyn, which was paid. By the present action Felcyn seeks a refund of such deficiency paid.

2. Plaintiff's expenses in this litigation are paid by Harry Margolis. The $1,600 deficiency in this case was paid from an account in the name of Harry Margolis.

#### B. *The Duncan Transactions*

3. The signatures of Felcyn, along with the signatures of William Berman, David H. Bruce, Mark D. Schiavenza, Robert S. Muehlenbeck, Philip M. Bardack, Ondrej Kojnok, R.H. Adolphson and G. Louis Graziadio III, appear on an undated document stated to be the "Duncan Properties Partnership Agreement." Messrs. Berman, Bruce, Bardack, and Graziadio were clients of Margolis. Felcyn and Messrs. Schiavenza, Muehlenbeck, Kojnok and Adolphson were employees of Margolis. The statements in this document are to the effect that Duncan is organized as a general partnership consisting of the individuals where signatures appear on the document. The document identifies the following amounts received as contributions from the partners indicated:

| | |
|---|---|
| William Berman | $ 10,000 |
| David H. Bruce | 10,000 |
| Mark D. Schiavenza | 10,000 |
| Robert S. Muehlenbeck | 15,000 |
| Philip M. Bardack | 10,000 |
| Ondrej Kojnok | 20,000 |
| G.H. Felcyn | 25,000 |
| R.H. Adolphson | 10,000 |
| G. Louis Graziadio III | 90,000 |
| | $200,000 |

The document states that its term will commence on November 1, 1976.

4. The bank records and other records of Duncan and of Antigua Banking Limited ("ABL") an Antigua company directed and managed by Margolis, show that on October 20, 1976, $200,000 was transferred from ABL's account at Barclays Bank of California ("Bar Cal") to Duncan's account at that bank. The records of ABL main-

tained at the Margolis office identify this transfer as a loan from ABL to Duncan. On this same day, October 20, 1976, the bank records and other records of Duncan show that $200,000 was transferred from Duncan's account at Bar Cal to an account in the name of Hexagram at Barclays Bank International Limited (Tortola) ("BBIL (Tortola)"). The records of Duncan identify this $200,000 transfer as a payment of interest to Hexagram on a $14,000,000 loan.

5. The $200,000 transfers from the account of ABL, to the account of Duncan, to the account of Hexagram, were components of a "cash flow" or "money movement" arranged by the Margolis office. The October 20, 1976, cash flow involved seventeen checking accounts at Bar Cal in the names of clients of the Margolis office or in the names of entities such as ABL directly managed by the Margolis office. The October 20, 1976, cash flow also involved checking accounts at BBIL (Tortola) in the names of Hexagram, a Netherlands Antillies corporation; World Entertainers, a Bahamian corporation; Interlit, a British Virgin Islands corporation; the Parallax Corporation, a Panamanian corporation; Wickhams Cay Trust Company, a British Virgin Islands company; Management and Trust Company International ("Matrucoin"), a Netherlands corporation; the Aruba Bonaire Curacao ("ABC") Trust Company, a Bahamian company, and Presentaciones Musicales, SA ("PMSA"), a Panamanian corporation.

6. The affairs of the identified foreign entities were dominated, manipulated and controlled by the Margolis office. With few exceptions, no person at the Margolis office ever served as an officer or director or bank signatory for any of these foreign entities. Nevertheless, the Margolis office effectively controlled the affairs of these foreign entities.

7. The Margolis office initiated the idea of the creation of these foreign entities, as well as the idea of the anticipated activities of the entities. The Margolis office made available funds for the capitalization and operation of these foreign entities. The Margolis office hired foreign-based management companies to act as shareholders, officers and directors of these foreign entities. The Margolis office hired foreign management companies to open and close bank accounts in the names of these foreign entities and act as signatories on such bank accounts. The Margolis office hired foreign management companies to maintain records in the names of these foreign entities based on information supplied by the Margolis office. From time to time the Margolis office would send its employees to work at these foreign management companies.

8. Acting on instructions from the Margolis office, these foreign management companies would create or liquidate foreign entities as required by the Margolis office. As directed by the Margolis office, foreign management companies would execute checks and authorization letters on the accounts in the names of the foreign entities. As directed by the Margolis office, these foreign management companies would sign documents in the names of foreign entities drafted by the Margolis office.

9. The Margolis office would advise its foreign managers of a contemplated "cash flow" by means of telexes. The telexes set forth the domestic to foreign, foreign to domestic, and foreign to foreign transfers that were to occur and listed the sequence and amount of each transfer. The Margolis office prepared cash receipt and check request forms for transfers to or from accounts in the names of foreign entities used in the cash flow. These forms set out the dates and amounts of the transfer and contained the manner in which the transfer was to be treated for purposes of preparing accounting records in the names of the foreign entities.

10. The October 20, 1976, cash flow included at least ninety-one (91) bank transfers between and among the domestic accounts at Bar Cal and the foreign accounts at BBIL (Tortola). The Margolis office took a collected fund equal to the largest single transfer on that date ($1,000,000) and circulated the fund, in whole or in part, through the various bank accounts until

debits and credits in amounts determined by the Margolis office were posted to the banks accounts. The checks drawn on the accounts in the names of the foreign entities at BBIL (Tortola) were in the form of transfer authorization letters all bearing the signature of Noel Barton. Noel Barton's office in Tortola was one of the foreign management companies hired by the Margolis office to maintain the flow of paperwork in the names of the various foreign entities. At the end of the October 20, 1976, cash flow, credits in the minimum amount of $18,771,159 had been posted to the accounts at BBIL (Tortola) in the names of the various foreign entities and also posted were corresponding debits in the minimum amount of $16,908,022.

11. For federal tax purposes, Duncan treated the $200,000 transfer as an interest pre-payment on a $14,000,000 loan from Hexagram. Duncan claimed $194,445 of the $200,000 as an interest expense deduction on its 1976 income tax return, which amount was passed down *pro rata* to the individuals identified as partners in Duncan, including Felcyn. Felcyn claimed part of her *pro rata* share as an interest deduction on her 1976 income tax return and carried the balance forward to her 1977 income tax return. Duncan claimed the remaining amount of the $200,000 transfer ($5,555) as an interest expense deduction on its 1977 income tax return, which amount was passed down *pro rata* to the individuals identified as partners in Duncan, including Felcyn who claimed her *pro rata* share on her 1977 income tax return.

12. The bank records and other records of Duncan and ABL, show that on October 24, 1976, $10,000 was transferred from ABL's account at Bar Cal to David Bruce's account at that bank and from there to Duncan's account at that bank, $10,000 was transferred from ABL's account at Bar Cal to Mark Schiavenza's account at that bank and from there to Duncan's account at that bank, $10,000 was transferred from ABL's account at Bar Cal to William Berman's account at that bank and from there to Duncan's account at that bank, $20,000 was transferred from ABL's account at Bar Cal to Ondrej Kojnok's account at that bank and from there to Duncan's account at that bank, and $15,000 was transferred from ABL's account at Bar Cal to Robert S. Muehlenbeck's account at that bank and from there to Duncan's account at that bank, for total transfers of $65,000 from ABL to the identified partners of Duncan to Duncan. Two days later, on October 26, 1976, $65,000 was transferred from Duncan's account at Bar Cal to ABL's account at that same bank. On November 8, 1976, $25,000 was transferred from ABL's account at Bar Cal to Felcyn's account at that bank and from there to Duncan's account at that bank and from there to ABL's account at that bank (i.e., ABL to Felcyn to Duncan to ABL, $25,000). On that same day $10,000 was transferred from ABL's account at Bar Cal to R.H. Adolphson's account at that bank and from there to Duncan's account to that bank and from there to ABL's account at that bank. The transfers from the individuals identified as partners in Duncan to Duncan were identified as "capital contributions" on the books and records maintained in the name of Duncan.

13. The signatures of two individuals identified as partners in Duncan appear on a document designated as a "Promissory Note" in favor of Hexagram. This document is dated November 11, 1976 and recites that Duncan promises to pay $14,000,000 to Hexagram, together with interest at the rate of 10% per annum, fifty-two days (52) from the date of the note. This document is materially identical to two similar notes dated November 1, 1976. The first of these similar notes recites that Brahms Properties Partnership (another identified partnership formed by the Margolis office), promises to pay $30,000,000 to Hexagram, together with interest at the rate of 10% per annum, one hundred twenty days (120) from the date of the note. The second similar document recites that Scorpio Properties Partnership (another identified partnership formed by the Margolis office), promises to pay $10,000,000 to Hexagram, together with interest at the rate of 10% per annum, three hundred sixty days (360) from the date of the note.

14. The signatures of Noel Barton and an individual working at Barton's office appear on four documents each stated to be a "Wickhams Cay Trust Company Limited Certificate of Deposit." The four documents are numbered consecutively 112, 113, 114 and 115. Document number 112 recites that on November 11, 1976, the sum of $14,000,000 was placed on deposit at Wickhams Cay Trust Company payable to Hexagram and earning interest at the rate of 9.75% per annum. Documents numbered 113, 114 and 115 are similar but for the stated deposits, which are $10,000,000, $15,000,000 and $15,000,000, respectively.

15. The signature of John R. Cogswell stated to be on behalf of Hexagram appears on four documents each stated to be an "Assignment of Certificate of Deposit", each dated November 11, 1976. The statements in each of these documents are to the effect that Hexagram is assigning its interest in the documents identified as "Wickhams Cay Trust Company Limited Certificates Of Deposit", numbers 112, 113, 114 and 115 as follows:

| CERTIFICATE NUMBER | IDENTIFIED ASSIGNEE |
| --- | --- |
| 112 | Duncan |
| 113 | Scorpio |
| 114 and 115 | Brahms |

John Cogswell was hired by the Margolis office to manage the affairs of Hexagram and Parallax, among others.

16. Four documents, each entitled "Assignment Of Certificate Of Deposit" and dated November 9, 1976, are stated to be assignments of the documents identified as "Wickhams Cay Trust Company Limited Certificates Of Deposit" numbers 112, 113, 114 and 115, from Duncan, Scorpio and Brahms, respectively, to Parallax.

17. The signature of John Cogswell, stated to be on behalf of Parallax, appears on four documents dated November 11, 1976, each appearing to be a letter from Parallax to BBIL (Tortola). Under the statements in this document Parallax is delivering to BBIL (Tortola) for collection the documents identified as "Wickhams Cay Trust Company Limited Certificates Of Deposit" numbers 112, 113, 114 and 115.

18. The signature of John Cogwwell stated to be on behalf of Parallax appears on four documents dated November 11, 1976, each appearing to be a letter from Parallax to Noel Barton at Wickhams Cay Trust Company. These documents recite that Parallax is assigning to Wickhams Cay Trust Company certain receivables held for collection on Parallax's behalf by BBIL (Tortola). The documents go on to recite that Wickhams Cay Trust Company is authorized to issue Certificates Of Deposit numbered 112, 113, 114 and 115 to Hexagram, in the face amounts of $14,000,000, $10,000,000 $15,000,000 and $15,000,000, respectively.

19. The signature of John Cogswell, stated to be on behalf of Parallax, and the signatures of two individuals identified as partners of Duncan appear on an undated document entitled "Loan Agreement." This document recites that it is effective as of November 1, 1976. Under the statements in this document Parallax agrees to obtain long-term financing for Duncan of an amount between $1,500,000 and $2,000,-000 at an interest rate equal to or less than six and one-half percent (6½%) per annum. In return, according to this document, Duncan will deposit $14,000,000, interest-free with Parallax for a period of fifty-two (52) days. Substantially similar documents exist for Scorpio and Brahms with the amount of the interest-free deposit stated to be $10,000,000 for Scorpio and $30,000,-000 for Brahms.

20. The signatures of two individuals identified as partners in Duncan appear on each of two documents entitled "Negotiable Promissory Note." Under the statements in the first of these documents, Duncan agrees to pay Matrucoin $1,000,000 at 6% interest per annum over a ten year period. The first document is dated "as of November 12, 1976." The second document is similar to the first, except that the amount is stated to be $800,000 and the document is dated "as of February 24, 1977."

21. The bank records and other records of Duncan show that on November 12, 1976, $1,000,000 was transferred from Matrucoin's account at BBIL (Tortola) to Duncan's account at Bar Cal. On that same

day $1,000,000 was transferred from Duncan's account at Bar Cal to the account of Anglo Dutch Capital Co. ("Anglo Dutch") at the same bank. These transactions were components of "cash flows" or "money movements" similar to the October 20, 1976, transactions. Anglo Dutch was owned and managed by Harry Margolis.

22. The bank records and other records of Duncan show that on February 24, 1977, $800,000 was transferred from Matrucoin's account at BBIL (Tortola) to Duncan's account at Bar Cal. On that same day $800,000 was transferred from Duncan's account at Bar Cal to the account of Anglo Dutch at the same bank. These transactions were components of "cash flows" or "money movements" similar to the October 20, 1976, transactions.

23. The bank records and other records of Duncan show that on December 28, 1977, $39,000 was transferred from Duncan's account at Bar Cal to Matrucoin's account at BBIL (Tortola). This transaction was a component of a "cash flow" or "money movement" similar to the October 20, 1976, transaction. For federal tax purposes Duncan treated this $39,000 transfer as a payment of interest to Matrucoin on a $1,800,000 loan. Duncan claimed this amount on its 1977 income tax return as an interest expense deduction, which amount was passed down *pro rata* to the individuals identified as partners in Duncan, including Felcyn. Felcyn claimed her *pro rata* share of this amount as an interest expense deduction on her 1977 income tax return.

24. Records obtained by the United States from the British Virgin Islands during discovery in this case contained the telex for the December 28, 1977, cash flow from Ines Teague of the Margolis office to Everd van Walsum, a foreign manager hired by the Margolis office. The telex set forth the sequence of the transfers as follows:

attn everd van walsum

dear everd:

i have not been able to reach noel. please try first thing in the morning to call him. here are the transmittals to be completed on 12-29-77 at 9:00 am san francisco time:

1. roseville limited—hexagram/ib 445,-000
2. palatine limited—hexagram/ib 444,000
3. shady trail limited—hexagram/ib 117,-000
4. we/ib—abl 1,000,000
5. bel haven leasing—hexagram/ib 26,-800 in
6. duncan properties partnership—matrucoin/ib 39,000 in
7. el rio dev. co.—abc/ib 177,172 in
8. abc/ib-ralph weinstock 23,000 out
9. abc/ib—jerome s. goldberg 11,900 out
10. abc/ib—bentley morriss 20,000 out
11. pmsa/ib—charles johnson—10,000 out
12. abl/ib 7500 in
13. abl—matrucoin/ib 10,938 in
14. abl-we/ib 102,705.36 in
15. we/ib—interlit (barclays) 160,000 (intra)
16. interlit—edward o throp 35,000 out
17. interlit—matrucoin/ib 97,2105.65 (sic.) (intra)
18. pmsa/ib—r. muehlenbeck trustee 150,-000 out
19. parallax/ib—adc 100,000 out
20. interlit—recorded properties of the master 23,914.27 out
21. mcmillan mortgage—abc/ib 110,000 in
22. abc/ib—mcmillan mortgage co. 9,208 out
23. t.g. mcmillan—hexagram/ib 530,000 in
24. abc/ib—ernest pellegrino 170,424.48 out
25. we/ib—abl 440,000 out
26. nevada enterprises part—hexagram/ib 150,000 in
27. abc/ib—meyer zeiler 3,500 out
28. nevada energy and heating part—matrucoin/ib 696,000 in
29. parallax/ib—adc 500,000 out
30. we/ib—abl 350,000 out
31. abl-we 825,000
32. ib—Lawyers title ins. co for credit of smiley co ltd escrow # 2015 200,000

33. ib—Lawyers title ins. co for credit of proposition propeties Limited escrow # 2057 95,000

34. ib—Lawyers title ins. co for credit of design builders Limited escrow # 2053 195,000

35. ib—Lawyers title ins. co for credit of agreed Limited escrow # 2059 145,000

36. ib—Lawyers title ins. co for credit of tyler company Limited escrow # 2044 193,000

items # 32 through 36 need bank name and account number. i will call noel directly as soon as information is available.

call me if you have any questions.

kind regards,

ines teague

re 11 above should read:

11. pmsa/ib—charles johnson 10,000 out

Attached to the telex are the cash receipts and check requests prepared by the Margolis office for both the foreign and the domestic sides of the transactions. The foreign entities involved were Hexagram, Parallax, ABL, ABC Trust Company ("ABC"), Matrucoin, World Entertainers ("WE"), and Presentaciones Musicales, SA ("PMSA"), previously identified, as well as Island Bank ("IB"), a British Virgin Islands Company. The Margolis office controlled the affairs of Island Bank in the same manner previously described.

25. The bank records and other records of Duncan show that on October 13, 1977, $70,000 was transferred from Duncan's account at Bar Cal to Matrucoins's account at BBIL (Tortola). This transaction was a component of a "cash flow" or "money movement" similar to the October 20, 1976, transactions. For federal tax purposes Duncan treated this $70,000 transfer as a payment of interest to Matrucoin on a $1,800,000 loan. Duncan claimed this amount on its 1977 income tax return as an interest expense deduction, which amount was passed down *pro rata* to the individuals identified as partners in Duncan, includ-

ing Felcyn. Felcyn claimed her *pro rata* share of this amount as an interest expense deduction on her 1977 income tax return.

26. To the extent any Conclusion of Law is deemed a Finding of Fact, it is incorporated herein.

CONCLUSIONS OF LAW

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1346(a)(1) (1976) and 26 U.S.C. § 7422(a) (1967).

■ 2. It is axiomatic that "deductions are a matter of legislative grace" and that the deduction in every instance will be allowed only where clearly provided under statute. *New Colonial Ice Co., Inc. v. Helvering,* 292 U.S. 435, 440, 54 S.Ct. 778, 790, 78 L.Ed. 1348 (1934). Further, in a tax refund suit such as this, the burden of clearly showing the right to the claimed deduction is on the taxpayer. *Interstate Transit Lines v. Commissioner,* 319 U.S. 590, 593, 63 S.Ct. 1279, 1281, 87 L.Ed. 1607 (1942). The taxpayer has failed to carry her burden in this case.

3. Section 163(a) of the Internal Revenue Code of 1954 (26 U.S.C.) permits an income tax deduction for "interest paid or accrued within the taxable year on indebtedness."

■ 4. The term "interest," as used in the Internal Revenue Code, is construed according to its ordinary business meaning. *Deputy v. Du Pont,* 308 U.S. 488, 498, 60 S.Ct. 363, 368, 84 L.Ed. 416 (1940).[1] The Supreme Court has defined interest both as "the amount which one has contracted to pay for the use of borrowed money," *Old Colony Railroad Co. v. Commissioner,* 284 U.S. 552, 560, 52 S.Ct. 211, 214, 76 L.Ed. 484 (1932), and, more broadly, as "compensation for the use or forebearance of money." *Deputy v. Du Pont,* 308 U.S. at 498, 60 S.Ct. at 368; *United States v. Midland–Ross Corp.,* 381 U.S. 54, 57, 85 S.Ct. 1308, 1310, 14 L.Ed.2d 214 (1965); see

1. Under the statute, the term "interest" is accorded its "usual, ordinary and everday meaning." *Old Colony Railroad Co. v. Commissioner,* 284 U.S. 552, 561, 52 S.Ct. 211, 215, 76 L.Ed. 484 (1932).

*Mayflower Investment Co. v. Commissioner*, 239 F.2d 624, 625 (5th Cir.1956). In order to have a deduction for interest under Section 163, the Supreme Court requires actual payment, i.e., the taxpayer must part with cash or with assets which are cash-equivalents. *Don E. Williams Co. v. Commissioner*, 429 U.S. 569, 578, 97 S.Ct. 850, 856, 51 L.Ed.2d 48 (1977); *Battelstein v. Internal Revenue Service*, 611 F.2d 1033, 1035 *aff'd en banc* 631 F.2d 1182 (5th Cir.1980). In the present case the transactions identified as payments of interest by Duncan were simply parts of a circularization of funds which do not amount to payments. *See Karme v. Commissioner*, 73 T.C. 1163, 1186 (1980), *aff'd* 673 F.2d 1062 (9th Cir.1982). The recent case of *Goldberg v. United States*, 789 F.2d 1341 (9th Cir.1986), reaches a similar result.

■ 5. For interest to accrue, at least within the meaning of § 163(a) (the interest deduction provision), there must be an underlying indebtedness. *See Deputy v. Du Pont*, 308 U.S. 488, 497–98, 60 S.Ct. 363, 368, 84 L.Ed. 416 (1940); *Golder v. Commissioner*, 604 F.2d 34, 35 (9th Cir.1979).[2] An indebtedness is an "unconditional and legally enforceable obligation for the payment of money." *Autenreith v. Commissioner*, 115 F.2d 856, 858 (3d Cir.1940); *Investors Insurance Agency, Inc. v. Commissioner*, 677 F.2d 1328, 1333 (9th Cir. 1982).[3] The mere possibility that a debt may arise in the future is not an indebtedness on which interest can accrue for purposes of the income tax deduction. *Estate of Franklin v. Commissioner*, 544 F.2d

1045, 1049 (9th Cir.1976). A loan which is conditional is unsuitable to support an interest deduction which requires an *unconditional* obligation for the payment of money. *See e.g., Autenreith v. Commissioner*, 115 F.2d 856, 858 (3rd Cir.1940); *Investors Insurance Agency Inc. v. Commissioner*, 677 F.2d 1328, 1333 (9th Cir. 1982). The $14,000,000 "loan" from Hexagram to Duncan was accomplished by taking a piece of paper entitled Certificate of Deposit in the face amount of $14,000,000 and assigning it around in a circle from Wickhams Cay Trust Company to Hexagram to Duncan to Parallax and back to Wickhams Cay Trust Company. Such financial gymnastics do not constitute a loan for tax purposes. The $1,800,000 "loan" from Matrucoin to Duncan was, like the identified payments of interest, simply parts of a circularization of funds which do not amount a loan.

■ 6. Of course, a tax deduction depends on the substance of a transaction. *See, Gregory v. Helvering*, 293 U.S. 465, 469, 55 S.Ct. 266, 79 L.Ed. 596 (1935); *Knetsch v. United States, supra*, 364 U.S. 361, 367, 81 S.Ct. 132, 135–36 (1960). In the present case, then, our inquiry must focus on "whether the substance of the transaction comports with the form." *Horstmier v. Commissioner*, 46 T.C.M. 738, 757 (1983), *aff'd in unpublished order* (9th Cir. October 25, 1985). *See Lazarus v. Commissioner*, 58 T.C. 854, 864, 91 (1972), *aff'd* 513 F.2d 824 (9th Cir.1975) ("in ascertaining such realities, a series of related transactions may not be broken into bits and pieces but must be viewed as a

---

**2.** Examples of cases in which purported interest payments have been disregarded by the courts because of the absence of genuine indebtedness include *Knetsch v. United States*, 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed. 128 (1960) (involving purchases of life insurance financed with "borrowed" funds), *Goldstein v. Commissioner*, 364 F.2d 734 (2d Cir.1966), *cert. denied*, 385 U.S. 1005, 87 S.Ct. 708, 17 L.Ed.2d 543 (1967) (involving the purchase of Government securities with "borrowed" funds), and *Kovtun v. Commissioner*, 54 T.C. 331 (1970), aff'd *per curiam*, 448 F.2d 1268 (9th Cir.1971), cert. denied, 405 U.S. 1016, 92 S.Ct. 1292, 31 L.Ed.2d 479 (1976) (involving purported interest payments with respect to real estate contracts).

**3.** For a true loan it is essential to provide for repayment absolutely and in all events, or that the principal be secured in some way as distinguished from being put in hazard. *In re Grand Union Co.*, 219 F. 353, 356 (2nd Cir.1914) certiorari denied sub nom. *Hamilton Investment Company v. Ernst*, 238 U.S. 626, 35 S.Ct. 664, 59 L.Ed. 1495 (1915); *National Bank of Paulding v. Fidelity and Casualty Company*, 131 F.Supp. 121, 123 (D. Ohio 1954). A loan requires an actual delivery of loan proceeds. *See* citations at definition of "loan" in Blacks Law Dictionary (5th ed. 1979).

whole."); and *Professional Services v. Commissioner*, 79 T.C. 888, 913 (1982). The activities present in this case are blatant shams which cannot support interest deductions.

7. Most, if not all, of the transactions present in this case are grounded on banking activities at Barclays Bank of California and Barclays Bank International, Limited (Tortola). These banking activities are the same sort of "circular money movements" found to be shams in other Margolis tax cases including *Karme v. Commissioner*, 73 T.C. 1163, 1186–1187 (1980), *aff'd* 673 F.2d 1062 (9th Cir.1982); *Scheaf v. United States*, 83–2 U.S.T.C. ¶ 9594 at 88,167–69 (N.D.Cal.1983) [available on WESTLAW, 1983 WL 1651]; *aff'd in unpublished order* (9th Cir. May 14, 1985); *Ford v. Commissioner*, 51 T.C.M. 608, 633–634 (1986); *Leonard v. Commissioner*, 49 T.C.M. 644, 660–661 (1985); *La Fargue v. Commissioner*, 51 T.C.M. 190, 222 (1985); and *Meyer v. Commissioner*, T.C. Memo 1986–328.

8. Simply stated, in the present case none of the loans have substance, therefore, no interest deductions are allowable. Even if the loans had substance, the payments of interest do not and, accordingly, such interest payments are not allowable.

9. Finally, we note that Felcyn failed to establish that she had any basis in Duncan which could support a deduction flow through from Duncan. Pursuant to Section 704(d) of the Internal Revenue Code of 1954 (26 U.S.C.) a partner's share of partnership loss is limited to the partner's adjusted basis in the partner's partnership interest. Here, Felcyn may not rely on the circular transfer of $25,000 on October 24, 1976, from ABL's account to her account to Duncan's account to ABL's account to establish her adjusted basis in Duncan. *See* 26 U.S.C. § 722 which requires a genuine contribution of money for the purposes of establishing basis, not a circular transfer among controlled bank accounts.

10. Based on the entire record in this case, judgment will be entered against the plaintiff and in favor of the defendant.

11. To the extent any Finding of Fact is deemed a Conclusion of Law, it is incorporated herein.

### ORDER FOR JUDGMENT

Judgment in this case is ordered for the defendant United States. Attached are findings of fact and conclusions of law which are in substantially the form proposed by defendant.

Some considerations which bear on this decision are:

1. The court is not convinced that the plaintiff had a true *investment* in the Duncan Partnership which would permit her to deduct investment interest. She borrowed the entire capital account—effectively from her employer. She had no expectation of gain until dissolution of the partnership. She was not at risk on anything since the long-term financing was nonrecourse. When she withdrew as a partner in 1978 she repaid $20,000 of the original $25,000 loan from the proceeds of distribution. The remaining $5,000 was not paid until 1985, and this was undoubtedly prompted by the pendency of this case.

2. While there is no question but that the Cucamonga property exists and that Duncan Partnership owned some of it, the preponderance of evidence does not establish the necessary "purposive business activity" to give rise to the deduction.

3. The 100% long-term financing (and nonrecourse at that) on the purchase of raw land is inherently suspicious. The lender, Matrucoin, was totally controlled by Margolis.

4. The "system" transactions generating the $200,000 interest item were clearly sham. The entities were devoted solely to handling the Margolis transactions and were themselves devoid of real substance. The creation of the $200,000 interest item was based on pure paper-shuffling and literally unreal transactions.

5. Plaintiff is right that she should be judged on the facts of this case and on her own position in the factual context here. She has been. In many respects this case

214

differs from the *modus operandi* discussed in other Margolis cases. It is also true, however, that the evidence relative to those cases is not wholly irrelevant to this one.

Defendant will file and serve a form of proposed judgment consistent with this order.